**Ralph H. FELTMAN, Appellant,**

v.

**Christos D. SARBOV, Appellee.**

No. 8518.

District of Columbia Court of Appeals.

Argued March 13, 1975.

Decided Nov. 22, 1976.

Robert J. Stanford, Washington, D.C., for appellant.

Samuel M. Shapiro, Washington, D.C., for appellee.

Before KELLY and HARRIS, Associate Judges, and REILLY, Chief Judge, Retired.

REILLY, Chief Judge, Retired:

This is an appeal from a judgment after a jury trial awarding plaintiff, a parking lot operator, $30,000 in compensatory damages and $30,000[1] in punitive damages. On

1. The original award of compensatory damages was for $30,000 but to keep within the then maximum jurisdictional amount it was reduced by plaintiff's voluntary remittitur motion to $20,000.

appeal, defendant, lessor of one of these lots, urges us to reverse, or to grant a new trial.

The complaint was divided into three counts—two of fraud, and one for breach of contract. A motion for a directed verdict by defendant was granted at the close of plaintiff's case on the breach of contract allegations.

According to the record, Feltman, a local businessman, leased with an option to renew, on February 7, 1964, some unimproved land on 20th Street in downtown Washington to Sarbov, a well-known parking lot operator. The negotiations were carried out and the lease drawn up by a lawyer retained by the landowner. The instrument contained a statement to the effect that it was the lessor's intention to develop the property to its fullest income potential and provided that in the event he should receive an offer in writing for sale, purchase, or long-term lease for the property, the lessee would be given a copy and 60 days to exercise his right to match the terms of the offer (*i.e.*, a right of first refusal). Insofar as pertinent, the lease provided:

It is further expressly agreed and stipulated, superseding any and all other provisions of this lease, that the lessors have and shall have the absolute right to terminate this lease and cause it to cease and end on or any day after October 6th, 1966, for the purpose of putting the property up for sale, for long-term lease (20 to 99 years), or for any other use, purpose, reason or desire without limitation or restriction of any kind upon the lessors, it being the present intention and desire of the lessors to immediately contact, interview, offer and deal with persons and companies—as they have been doing in the past to interest such and all in buying or acquiring the premises, or in negotiating and entering into contract(s) of long-term leasing looking toward the erection of an apartment, office or other building or structure thereon, to the end that the lessors may have and gain the maximum price, earnings, income or return of and from the use of said property, and this lease shall in no wise limit, (interfere with or in any manner prevent or limit the lessors in and from exploiting the property to the full of its value and income potential). The lessees understand and agree that their tenancy in all probability will not continue longer than Thirty Six (36) months beyond its date of beginning.

If during the renewal terms of this lease, should the lessors or their successors in interest receive in writing a bona fide offer for the sale, purchase or long-term lease of the premises (20 to 99 years), which the lessors desire to accept, then the privilege of buying or long-term leasing the demised premises on the same price, terms and conditions, with the same cash, financial security and other benefits to the lessors as other persons or companies have offered and are otherwise as acceptable to the lessors, and they shall be given sixty (60) days within which to exercise this privilege from the date that the lessors deliver to lessees or either of them a copy of the proposed sale, long-term lease or other disposition, and upon the written notification to the lessors or their successors of the exercise of this option by the lessees, the lessors shall be bound to accept or enter into a long-term lease with the lessees.

Following the expiration of the original term of the lease Sarbov, who testified that he was losing between $1,500 and $2,000 per month on this parking lot operation, was encouraged by lessor's counsel to renew the lease despite a substantial increase in property taxes which Sarbov had to bear. According to Sarbov's testimony, in entering into a lease for another term, he relied upon assurances by counsel that if the option to renew the lease was exer-

cised, the lessee would maintain his valuable right of first refusal, and that in the event a new building was subsequently constructed, counsel would see to it that Sarbov received the garage concession. He also assured Sarbov at one conference concerning this lease renewal in the presence of two other attorneys, both of whom testified for the plaintiff at trial, not only that he had the power to make these statements on behalf of his client but that his client would do what he was told.

At the time these negotiations were taking place, appellant Feltman had already made arrangements with a long-standing business associate to erect an office building on the site of the parking lot. The understanding was that this associate would gain an interest in the projected building by arranging financing, guaranteeing whatever loans were made, and supervising its construction.

Approximately 20 months after the renewal of the lease, Sarbov was asked to vacate the premises by appellant's attorney, who repeated the promise that Sarbov would get the parking concession in the new building. On this occasion, the attorney advised Sarbov that Feltman and his wife, without partners, were about to put up an office building. Sarbov vacated the lot a few days later without insisting upon the 90-day notice provided in the lease.

Subsequently Feltman and his business associate executed a written partnership agreement which gave the latter a 40% interest in the project. When the building was ultimately erected, the garage contained only enough parking spaces for the tenants and Sarbov was never offered a lease for this facility.

In urging this court to affirm the judgment for damages, Sarbov argues that he was the victim of actionable fraud as he had relied not only on false assurances that he would obtain the parking concession in the new building, but had renewed an unprofitable lease only because the lessor represented that the provisions contained in that instrument giving him a right of first refusal were valuable. He points out that as these representations were made at a time when, in fact, Feltman had already entered into an unwritten agreement to go into partnership with another businessman and develop the property, thereby making the option in the lease to match any offer for purchase or leasehold illusory. Had he known this, he contends, he would have refused to continue a parking operation in which he was losing approximately $1,500 or $2,000 monthly.

Stressing the fact that none of these promises or representations was actually made to Sarbov by appellant, the latter's position is that his attorney had no authority to make them and consequently appellant cannot be charged with responsibility for anything outside the written terms of the lease itself. Thus, we have the preliminary issue of determining whether there was any evidence of actual or apparent authority in appellant's attorney with respect to his dealings with Sarbov.

In *Insurance Management of Washington, Inc. v. Eno & Howard Plumbing Corporation*, D.C.App., 348 A.2d 310, 312 (1975), we noted:

> Apparent authority arises when a principal places an agent "in a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold. This falls short of an overt, affirmative representation by a principal . . . ." [Citing] *Drazin v. Jack Pry, Incorporated*, D.C.Mun.App., 154 A.2d 553, 554 (1959).

In such circumstances, an agent's representations need not be expressly authorized by his principal for, as we have observed, in *Jack Pry, Incorporated v.*

*Drazin,* D.C.Mun.App., 173 A.2d 222, 223 (1961):

> The apparent authority of an agent arises when the principal places the agent in such a position as to mislead third persons into believing that the agent is clothed with authority which in fact he does not possess. (Footnote omitted.)

In the instant case, appellant admitted that he had authorized his attorney to negotiate the parking lease with Sarbov. Moreover, he held out this attorney as the person with whom the lessee should deal. The attorney not only drafted the lease but also handled all the negotiations with regard to its initial execution, its renewal, and its premature termination.

The existence of apparent authority is a question of fact that must be proved by the party who asserts it. *McDonald v. Stone,* D.C.Mun.App., 86 A.2d 624 (1952); *Rustler's Steak House v. Environmental Associates, Inc.,* D.C.App., 327 A.2d 536 (1974). On this record, there was sufficient evidence to permit the trial court to have submitted this question to the jury.

■ A more difficult issue is whether any of the representations attributed by plaintiff and his witnesses to lessor's counsel constituted fraud. Appellant makes the point—with which we are inclined to agree—that his understanding with his prospective business partner for financing and erection of a building on the premises, did not constitute a "proposed sale, long-term lease or other disposition" within the meaning of the first refusal clause of the lease. It may· also be concluded that such oral understanding did not commit appellant so irrevocably that he could no longer solicit or accept offers from third parties for purchase or lease. He also argues with some force that the promise of a parking concession in any new building was not a binding obligation,

as it was not in writing and was never incorporated in the lease. It is well-settled that a lease for a term of years is a contract of an interest in real estate which must be executed in accordance with the statute of frauds to possess validity. *Jacobsen v. Sweeney,* 92 U.S.App.D.C. 93, 202 F.2d 461 (1953).

Despite these considerations, we deem the award of compensatory damages supportable in that there was some evidence of reliance upon a representation that was fraudulent. At the time lessor's attorney persuaded Sarbov to renew the parking lease, despite the latter's reluctance to incur further losses, on the ground that the option in the lease was a valuable one for a real estate speculator, he knew of the understanding between his client, the appellant, and his coadventurer. Even though these arrangements were inchoate, Sarbov might well have inferred, had he been aware of them, that the prospect of an opportunity to exercise the so-called valuable right was extremely remote.

Consequently, counsel's failure to disclose his client's plans when he spoke glowingly of the first-refusal-clause could be regarded as the concealment of a material fact. The jury might have concluded that had this fact been revealed, Sarbov would not have entered into a contract which was to his financial detriment. So viewed, such nondisclosure amounted to fraud. *Price v. Griffin,* D.C.App., 359 A. 2d 582, 588 (1976). Appellant contends, however, that this particular ground for recovery was not set forth in plaintiff's original complaint. This is true, but the contention overlooks an amendment to the complaint—conforming the pleadings to the proof—granted by the court before the case went to the jury.

In *Rosenberg v. Howle,* D.C.Mun.App., 56 A.2d 709, 710 (1948), we held:

> Generally actionable fraud is the concealment of a fact which should have

been disclosed, or is the representation of the existence of a material fact which did not exist. That representation must be positively made knowing it to be false, or recklessly and positively made without knowledge of its truth. The party to whom the representation is made must not only be warranted in accepting it, but he must actually accept it, and, relying on its truth, act as contemplated by the party making it. [Footnote omitted.)

It is our opinion that the conduct of appellant's agent in the case under review could justifiably have been found actionable fraud as so defined. Accordingly, the judgment of $20,000 in compensatory damages shall stand.

 Because of the narrow ground on which the finding of fraud rests, however, we hold that the award of punitive damages must be set aside. In *Price v. Griffin, supra* at 589, where a judgment for punitive damages was also reversed, we said:

Punitive or exemplary damages are not a favorite of the law. *Brown v. Coates,* 102 U.S.App.D.C. 300, 253 F.2d 36 (1958); *Gombos v. Ashe,* 158 Cal. App.2d 517, 322 P.2d 933 (1958); *White v. Doney,* 82 ·Idaho 217, 351 P.2d 380 (1960). Such an award is proper only when the tort is aggravated by "evil motive, actual malice, deliberate violence or oppression". (Citation omitted.)

*Accord, Wanis v. Zwennes,* D.C.App., 364 A.2d 1193 (1976).

In *Riggs National Bank v. Price,* D.C. App., 359 A.2d 25, 28 (1976), we observed:

Such damages are awarded to punish a person for outrageous conduct such as maliciousness, wantonness, gross fraud, recklessness and willful disregard of another's rights. *Franklin Investment Co. v. Homburg,* D.C.App., 252 A.2d 95 (1969). *Washington Garage Co. v.*

*Klare,* D.C.App., 248 A.2d 681 (1968). However, it has been said that such damages are not favored. *Brown v. Coates,* 102 U.S.App.D.C. 300, 253 F.2d 36 (1958). (Footnote omitted.)

In applying these principles to the case before us, we find the record devoid of any of the special aggravating circumstances upon which a verdict for punitive damages could be based.

*Affirmed in part, reversed in part, and remanded for the entry of a judgment consistent with this opinion.*