Vikramaditya RAILAN,
et al., Appellants,

v.

Jagdish K. KATYAL, et al., Appellees.

No. 96–CV–1711.

District of Columbia Court of Appeals.

Argued April 22, 1998.
Decided Feb. 15, 2001.

David G. Leitch, with whom Audrey J. Anderson, was on the brief, Washington, DC, for appellants.

Leonard L. McCants, for appellees.

Before SCHWELB, KING * and RUIZ, Associate Judges.

RUIZ, Associate Judge:

This is an appeal from the judgment on a jury verdict awarding compensatory and punitive damages for breach of an oral contract and fraudulent misrepresentation and from the trial court's denial of a counterclaim for a deficiency judgment. We affirm in part and reverse in part.

## I.

### Statement of the Case

Appellees, Jagdish ("Jack") Katyal and his wife, Mohana Katyal, sued appellants, Vikramaditya ("Vik") Railan and his wife, Dr. Veena Railan (the Railans), for breach of contract, fraudulent misrepresentation, and injunctive relief to halt a foreclosure sale on a building housing the Katyals' restaurant, The Tandoor, in Georgetown. The dispute stemmed from an alleged oral agreement that the Railans would pur-

chase a bank note secured by that building on which the Katyals had defaulted, and forbear on foreclosure in exchange for certain interest payments, the outstanding debt, and a bonus. After appellants, the Railans, foreclosed and bought the property at the foreclosure sale, they filed a counterclaim seeking a deficiency judgment equaling $150,000 (the difference between the amount outstanding on the bank note and the amount for which the Railans purchased the property at foreclosure), plus all interest, taxes, liens, assessments, fines, fees and other miscellaneous costs relating to the property. The Railans also filed a complaint in the Landlord Tenant Division for possession of the building housing the restaurant due to the Katyals' failure to vacate the building after having received a notice to quit from the Railans.

After a series of motions to amend, for summary judgment, and to exclude certain evidence (discussed below where relevant), the complaints were consolidated and the case was tried before a jury. After the trial court denied the Railans' (noteholders) motion for directed verdict, the jury found for the Katyals (debtors) and awarded $728,080.70 in damages on the breach of contract claim, which was exactly the amount owed by the Katyals to the Railans on the note the day the Railans purchased the note from the bank. The jury also awarded $50,250 in compensatory damages from each of the Railans on the fraud claim; and an additional $50,250 from each of them in punitive damages. Because the parties had agreed prior to the verdict that the jury's verdict would resolve the Railans' landlord-tenant complaint for possession and counterclaim for deficiency judgment, the trial court entered judgment for the Katyals on these issues. The Railans moved to set aside the judgments in favor of the Katyals, and for judgment as a matter of law or a new trial. The Railans argued they were entitled to judgment as a matter of law because the statute of

* Judge King was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on November 23, 1998.

frauds precluded enforcement of the alleged oral contract, and the evidence was insufficient to prove fraud by clear and convincing evidence. The trial court denied the motion after considering it under Rules 50(b) (motion for judgment as a matter of law), 59(b) (motion for a new trial), and 59(e) (motion to amend or alter judgment). The Railans appeal both the judgment on the verdicts and the order denying post-trial relief.

## II.

### Statement of Facts

Jack Katyal, once the successful owner of many restaurants in various east coast cities, had fallen on hard times, and filed for bankruptcy in 1992. Katyal and his wife owned the Tandoor restaurant and the building in Georgetown where it was located, as well as several other properties. After filing for Chapter 11 bankruptcy, the Katyals' banks were foreclosing on many of the properties on which they had defaulted. Although the Katyals had defaulted on the note held by First Union Bank for the Tandoor property, the bank had not foreclosed on the note, and the Katyals were seeking someone to purchase the note on terms which would enable them to continue to operate the restaurant, collect rent from various commercial and residential tenants in the building, and pay off the note in two years.

Jack Katyal and Vik Railan met at a party at the Tandoor restaurant—Katyal testified the party was at the "end of September" 1993, while Railan testified it was a New Year's party on January 8, 1994. Railan, an investor in real estate, and Katyal began to discuss the possibility of Railan purchasing Katyal's properties at foreclosure sales. Railan quickly purchased one of Katyal's properties, and the two began to meet frequently to discuss the possibility of Railan purchasing the note on the Tandoor restaurant property.

Katyal and Railan gave differing accounts at trial of the negotiations which followed. Katyal testified that he told Railan that "there are two guys trying to help me purchase" the bank note on the Tandoor restaurant property, and that one man in particular proposed that he would purchase the note from the bank at a discount, then charge Katyal that amount over two years at nine and a half percent. Katyal stated that Railan called him back a few days later, in early April 1994, saying "Jack, don't go to this loan shark and things.... I think I will be able to help you to buy this note from the bank and I will give you two years and I'll never shape [sic] at your bank." Katyal further testified, "I think it was mutual understanding and Mr. Railan and me, that he will foot the note because he's the one who suggested me not to go to his loan shark, you know."

Katyal summarized the terms of the deal he contends were agreed upon with Railan:

> Pay him back [the discounted purchase price of the note] and plus the hundred thousand dollars, two years was the maximum period.... [I]f I could not pay him off five fifteen plus the hundred thousand dollar within two years he has all right to foreclose me.... I will pay him nine and a half percent.

Katyal also stated that he and Railan had agreed that Katyal would pay one month back taxes and one month current taxes on the property. Katyal said that he then faxed to his loan officer at the bank, Kelly Parden, a letter telling Parden to negotiate with Railan for purchase of the note.[1] Katyal also testified that he and the bank informed Railan of Katyal's financial situation and property taxes owed on the Tandoor restaurant building, and

---

1. Kelly Parden testified that on May 17, 1994, about one month after he began negotiations with Railan, but before Railan purchased the note in September 1994, Katyal referred one other possible purchaser of the note to the bank. There was no evidence presented on whether there was any follow-up on Katyal's referral.

that Railan himself had sought Katyal's Chapter 11 documents from the court. Katyal stated that there were many ongoing meetings about Katyal's debts and restructuring plans.[2]

Katyal described the close personal relationship that developed during this period between the two men: that they spoke frequently, Railan referred to him by the affectionate Indian term for "big brother," and that Railan's wife, Dr. Veena Railan, had treated him one night in late July or early August 1994, when he suffered from high blood pressure. Katyal said that the very next morning, Railan called him and said:

> Don't worry about the property, I'm buying the note. I had discussed with the bank and I'm going to give you two years to restructure your loan and things and ... all of things we have discussed ...

Katyal finally described the events of late September 1994, after Railan purchased the note from the bank at a discounted rate of $515,000 (the face amount due on the note was $700,000). Katyal said that Railan did not see him for approximately one week after the purchase and that when he arrived at the Tandoor restaurant on September 29, Railan first asked Katyal to sign a letter recognizing that Railan had purchased his note. Katyal further testified:

> I said, you know, I don't have objection to sign it. What about my note? He says, let me write that and I can—we can work on that note also. So, we started ... he was start [sic] writing how much would be nine and a half percent for four hundred fifteen thousand dollar [sic]. And I says [sic] you want to write that note with hand too? He says no, why don't you come to my home this evening? I like to write this note in front of my father-in-law and my wife.

Katyal testified that when Railan went to pick him up that evening, Railan asked for the paper with the calculations he had done earlier that day. Katyal said that when he told Railan he had thrown the paper away, Railan informed him: "I am not going to give you two years any more, because I decided to foreclose you." Katyal testified that Railan claimed to be following his lawyer's advice. During that conversation, Railan received a call on his car phone from someone Katyal believed was Dr. Railan, and that Railan explained that, yes, "he had told Mr. Katyal that, and he is kind of upset and things, you know."

Katyal further discussed a meeting between the men facilitated by a leader in the Indian community, Dr. Singh, in which Katyal sought to convince Railan not to foreclose on the property. At that meeting, Katyal testified, Railan offered that he would not foreclose in exchange for the Tandoor restaurant's liquor license, but Katyal explained that there was already a lien on that license. At the foreclosure sale, on November 1, 1994, Railan was the only bidder on the property, which he purchased for $550,000. As owners of the property, the Railans sought to obtain possession of the property from the Katyals and a deficiency judgment in the amount of $150,000, the difference between the face amount due on the note and the purchase price of the foreclosed property.

Railan's counsel neared the end of his cross-examination of Katyal by asking, "When are you alleging that fraud was perpetrated on you?" That question prompted the following answer and exchange:

> [Katyal] Actually, the 29th of September. Then he asked me to give him the piece of paper and I said I don't have it and I throw it away [sic], and then, the one next minute he told me he has indicated to his lawyer to foreclose me [sic].

---

**2.** On cross-examination Katyal admitted that he understood that the bank could have sold the note on the Tandoor restaurant property to anyone, with or without his permission.

Q. So, ... your testimony is not that the fraud was his indication to you that he wanted to help you in purchasing this property and give you two years and so on and so forth, and ... that somehow the fraud was something else when he refused to write a piece of paper.

A. Yes, because, I don't know what is in his mind. Maybe he would have been sincere to me. I'm not saying that he wasn't.... Obviously, it shows that, you know—the record shows ... that was happened is intention [sic], because he knew everything about taxes and things, what was going on.

The final questions addressed to Katyal on cross-examination concerned Dr. Railan:

Q. Dr. Railan over here, other than speaking to her on the phone occasionally—and he [sic] never talked in terms of this deal, is that correct?

A. No sir, I didn't.

Q. And you are not claiming that she ever did anything to defraud you?

A. No.

Q. That she ever made any representation to you to defraud you?

A. No sir. I am not saying [sic].

Katyal also introduced testimony by three other members of the Indian community who spoke of the alleged deal between Katyal and Railan, and of the bank officer, Kelly Parden. Ragibommanalli Sundaresh testified that he sat at a table at the Tandoor restaurant when Katyal recited the terms of the agreement while Railan listened and "nodded in agreement" without saying anything. Katyal's brother, Suresh, also testified that while he was working at the restaurant, he overheard the conversation testified to by Sundaresh.

Dr. Singh testified about the meeting he arranged between Katyal and Railan, and Railan's answer to Dr. Singh's question about whether Katyal and Railan had an understanding:

Mr. Railan said, in a way, he did. There was not[h]ing i[n] writing, but i[n] a way,

he did. He didn't categorically tell that he had agreed and there was a written understanding.

Dr. Singh testified that Railan told him he had changed his mind because

he learned that there were serious financial problems with Jack ... and this was a—strictly a business decision, had nothing to do with his friendship and he says that to protect himself, what he learned subsequent to that understanding arrangement, he had to go for foreclosure.

Kelly Parden, the bank officer, testified that three potential purchasers of the bank note on the Tandoor restaurant building other than Railan pursued negotiations with him. Parden stated that he told Railan in their first discussion that he, Parden, would need consent from Katyal before they could negotiate further. Parden nevertheless conceded on cross-examination that if a purchaser arrived at the bank prepared to buy the note, the bank would have sold the note without seeking Katyal's permission. Parden testified that Railan told Parden that he would "give [Katyal] two years," and that Parden had spoken with Railan several times about the taxes due on the property. Parden claimed that the bank received a letter from Railan in which Railan acknowledged Katyal's outstanding tax debt. A redacted copy of that letter was introduced as evidence. Parden also stated that on the day Railan purchased the note on the Tandoor restaurant building, Railan "was looking for reassurance that his right to foreclose was still in place."

Vik Railan and Dr. Railan testified in their own defense. In essence, Railan denied that he and Katyal ever agreed on terms under which Railan would forbear from foreclosing if he purchased Katyal's note to the bank, and testified that Railan had not planned to foreclose on the note until he learned that Katyal had no funds or intentions of paying his property taxes on the Tandoor building, and that if the city foreclosed on the building due to the

tax debt, the city had priority over his bank note, and he could lose his investment.[3] Dr. Railan testified that she never negotiated with Katyal over the note, and that she would never have agreed to a deal without putting it into writing and consulting with her attorney.[4]

*Pre-trial exclusion of evidence*

The trial court ruled that neither party would be permitted to raise a conversation which allegedly took place at the Tandoor restaurant a few days prior to Railan's purchase of the bank note, in which Railan, Katyal and his attorney, Mr. McCants, were present. Railan described the meeting in this way:

> [T]hree or four days before we purchased the note Mr. [McCants], Mr. Katyal were sitting in the restaurant having lunch with me. I was there with them, and then Mr. [McCants] said, "Why don't you take his deal he's been offering you?" I said, "Mr. [McCants], I can't at this time. I have to talk to my lawyer. You are a lawyer. I'm not a lawyer. I don't even know if it's legal." Both of them said, "It's legal, you take

**3.** Railan testified:

> I said I will try to buy the note and I will see what I can do. It was just a proposal to some loan companies which he was just taking from them and giving it to me verbally. So, I spent like five hundred twenty thousand dollars. But, right before buying the note, ... he realized that this real estate taxes about [sic], but they come before the first trust. That technicality I didn't know and I tried to get out of my deal with First Union.

**4.** Dr. Railan testified as follows:

> Q. [D]id Mr. Railan ever indicate to you that he and Mr. Katyal had an affirmative agreement as to what would happen once he purchased the note?
> A. No sir, he didn't, and also I wouldn't have accepted, because all the real estate investments, whatever he has done so far, I have always done in writing, which I finalize everything through an attorney. I have never even—even if he had a verbal agreement, it was always finalized.

Mr. Railan also testified concerning his wife's involvement in business transactions generally and, specifically, in the subject one concerning the Tandoor restaurant property:

this, $100,000 you can take this—take this deal...." They were forcing it down my throat, You Honor.... I never took or accepted this deal.[5]

McCants, who was Katyal's trial attorney and is counsel on appeal, remarked that "what [Railan] just said to you is absolutely incorrect." McCants contended that the discussion concerned the taxes Katyal owed to the District of Columbia on the Tandoor property.

The trial court explained its decision to exclude testimony regarding that meeting:

> And the basis for this ruling is two fold. One, it honors a prior agreement reached between the parties. It prevents Mr [McCants] from being a witness at trial and albeit [sic] the need of his withdrawal, which—and this is the second and very important reason— would delay resolution of this case.

The Railans filed a motion to reconsider the court's pre-trial order excluding McCant's testimony in which they argue that there was never

> Q. When you were negotiating this deal with the bank, your wife participated in some negotiating with the bank as well, is that correct, sir?
> A. Yes, sir.
> Q. And yet, you testified on direct she was aware of your actions in terms of what you were doing with respect to Mr. Katyal as well, is that correct?
> A. Yes, sir.
> Q. And, you pretty much did not make any decision with respect to this property dealing with Mr. Katyal unless you consulted with your wife before doing it, is that correct?
> A. Yes, sir. But I'm not saying that either she did or I did any fraud on Mr. Katyal.

**5.** On further examination, Railan emphasized that he had not agreed:

> Q. [D]id you agree at that table, on that date, did you acknowledge that, in fact, that was the terms of the contract you had agreed to ?
> A. I did not. I told him very clearly I need to talk to a lawyer before I could agree to anything. And, I said this to Mr. McCants [Katyal's attorney] also before, a week before closing.

any agreement with Mr. McCants not to raise the meeting where Mr. Railan's testimony would be that he was clearly equivocal and clearly undecided about whether to engage in any contract with Mr. Katyal and he was extremely concerned about arranging for Mr. Katyal to start paying real estate taxes on the property, which Mr. Katyal never did.

*Jury Instructions*

At the conclusion of trial, the judge instructed the jury on punitive damages [6] and on the measure of damages for fraudulent misrepresentation [7] and gave the standard multiple defendant instruction, but gave no instruction concerning agency.[8]

## III.

### Analysis

On appeal, the Railans make three arguments for judgment as a matter of law on the jury verdict finding breach of contract: 1) the statute of frauds precludes enforcement of the oral contract, 2) the award of damages for breach of contract is not supported by the evidence, and 3) the evidence was insufficient to hold Dr. Railan liable on the contract. With respect to the

finding and verdict on the fraud action, the Railans argue they are entitled to judgment as a matter of law because there was not clear and convincing evidence of fraud, and that, in any event, the damages awarded are cumulative of the contract damages. They also contend that the evidence was insufficient for a finding of the ill will or malice necessary to support punitive damages. Finally, they argue that the trial court's rejection of their counterclaim for a deficiency judgment was erroneous and should be reversed. The Railans also argue that, if judgment is not entered in their favor, they are entitled to a new trial.

 We review a ruling on a motion for judgment as a matter of law after a jury verdict *de novo*, applying the same standard as the trial court. *See Durphy v. Kaiser Foundation Health Plan of Mid–Atlantic States, Inc.*, 698 A.2d 459, 465 (D.C.1997). Judgment as a matter of law may be granted only if, viewing the evidence in the light most favorable to the opposing party, there is "no legally sufficient evidentiary basis for a reasonable jury to find" for the non-moving party. Super. Ct. Civ. R. 50. This is an exacting standard, and "[i]t is only in the unusual case, in which only one conclusion could

6. The trial judge instructed:
 [Y]ou may award punitive damages only if you find that the act or acts of the defendant were malicious and wilful, wanton and reckless in disregard of the plaintiff's rights. You may award punitive damages against the defendant only if you find that the plaintiff has proven by clear and convincing evidence that the defendant acted with malice and with wilful, wanton or reckless disregard of the plaintiff's rights.

7. The trial judge instructed:
 The measure of damages which the person to whom a fraudulent misrepresentation is made is entitled to recover [sic] his pecuniary loss which results directly and foreseeably from the falsity of the matter represented. Recovery must be limited to such damages as you find to have foreseeably been expected to follow from the character of the misrepresentation itself.
 In assessing the pecuniary loss resulting from the falsity of the matter represented,

you may include first the difference between the value of the property and the price paid for it, and second, other pecuniary loss suffered as a consequence of the plaintiff's reliance upon the truth of the representation.

8. Railan asked the trial court to give an instruction to make it:
 clear to this jury that while Mr. Railan . . . may have been able to perpetrate a fraud, if in fact that is what they believe, that they still have to find that [Dr.] Railan either somehow participated in that or acquiesced in it or consented to it or did something that participated [sic] in order to impose upon her those same type of penalties.
 The court responded, with no objection from Katyal, by stating its intention to give the standard multiple defendant instruction; an instruction covering agency was never proposed nor given.

reasonably be drawn from the evidence, that the court may properly grant judgment notwithstanding the verdict." *Homan v. Goyal,* 711 A.2d 812, 817 (D.C. 1998) (see Part III on p. 1006) (internal citations and quotations omitted).

## IV.

### Statute of Frauds

On appeal, the Railans contend that they were entitled to judgment as a matter of law because the statute of frauds precluded evidence of the oral contract to be presented to the jury because it concerned a putative oral contract involving real estate which by its terms could not be performed within one year of its alleged formation. The trial court considered the statute of frauds at several junctures. The Railans raised the statute of frauds as a defense in their answer to the complaint and in their motion for summary judgment. Although the trial court initially granted the Railans' motion and dismissed the contract claim, it subsequently reconsidered its ruling, explaining that the statute of frauds was not a bar:

> Assuming plaintiffs' facts, as the court must, the defendants deceived plaintiffs into dealing with the bank on their behalf to purchase the property at a highly discounted rate. After purchasing the note and contracting with plaintiffs to pay defendants 9.5% interest on the purchase price of the note for two years, and in two years pay the defendants the note's purchase price and $100,000.00, defendants told the plaintiffs that a written contract was unnecessary since they had just foreclosed upon their property. Defendants deceived plaintiffs into helping them acquire the note, lied about the foreclosure, and entered into a contract they had no intention of honoring and

are therefore estopped from asserting a statute of frauds defense. Equitable estoppel will bar a party from asserting the Statute of Frauds when its own fraud is responsible for the absence of a written agreement. *See Rafferty v. NYNEX Corp.,* 744 F.Supp. 324, 330 (D.D.C.1990), *aff'd in part & rev'd in part,* 60 F.3d 844, 314 U.S.App.D.C. 1 (1995).

In denying the Railans' motion for a directed verdict, the trial court orally ruled mid trial that as a matter of law the statute of frauds did not bar introduction of evidence of the oral contract, stating:

> Consideration given by Mr. Katyal was the forgoing of other opportunities to allude [sic] negotiations of the note so as to allow him to continue in his business. The statute of frauds is no impediment when the evidence is taken in that light. Because of the fraud and the principles that make an oral contract binding under these circumstances, and without finding that's what happened, plaintiff has a right to proceed in the matter as a matter of law.

■ The statute of frauds mandates that certain agreements, including those concerning real estate, must be in writing "to guard against perjury and protect against unfounded and fraudulent claims." *Tauber v. District of Columbia,* 511 A.2d 23, 27 (D.C.1986); *see also* D.C.Code § 28–3502 (1996).[9] As the trial court recognized, there are certain limited exceptions to the statute of frauds:

> There are several situations where courts may refuse to allow the defendant to interpose a statute of frauds defense even if it is properly raised: [I]n the early history of the statute a defendant was denied the privilege of pleading [it] in three main instances: (a) where his

---

9. D.C.Code § 28–3502 provides:
 An action may not be brought ... upon a contract or sale of real estate, of any interest in or concerning it, or upon an agreement that is not to be performed within one year from the making thereof, unless the agree-

ment upon which the action is brought, or a memorandum or note thereof, is in writing, which need not state the consideration and signed by the party to be charged therewith or a person authorized by him.

own fraud was responsible for the non-existence of the required signed memorandum [equitable estoppel]; (b) where the equitable doctrine of part performance was applicable [promissory estoppel], and (c) where the defendant has admitted the contract [waiver].

*Hackney v. Morelite Constr.*, 418 A.2d 1062, 1066 (D.C.1980) (citation omitted).

■ We disagree with the trial court's conclusion that the present situation comes within one of the limited exceptions to the statute of frauds. In the present case, far from stipulating facts which recognize an agreement between the parties, Railan steadfastly denied that he ever orally agreed to the terms proposed by Katyal. This is not a case, like *Hackney*, where the parties stipulated to facts sufficient to establish an oral agreement. Thus, we are not faced with a situation where a defendant

> can admit an honest obligation and yet defeat its enforcement by pleading that the agreement was only oral and that there is no written evidence of the obligation as required by the Statute of Frauds.

*Id.* at 1066–67 (citation omitted).

In *R & A, Inc. v. Kozy Korner, Inc.*, 672 A.2d 1062 (D.C.1996), the buyer testified that the "purchase agreement was not reduced to writing because [the seller] did not want the sale in writing;" and that "monthly payments were made in cash because [seller] requested ... that these payments be made in cash...." *Id.* at 1066. This court found that a jury could reasonably conclude that the seller fraudu-

lently misrepresented his intentions to sell and that the buyer paid money to the seller in reliance of their oral agreement. In that circumstance, the court found an exception to the statute of frauds due to part performance. Moreover, although not relied upon in the opinion, the facts clearly presented that one side fraudulently induced the other not to reduce the purchase agreement to writing.

In the case before us, the Katyals contend that one week after the Railans purchased the note, Katyal, at Railan's request, signed a statement indicating that Railan had purchased the note on the Tandoor property, and after one of them jotted down on a napkin at the restaurant a written calculation of monthly interest payments Katyal allegedly would pay to Railan for a two-year period, Railan told him to go by Railan's house that night to write "this note" in front of his wife and father-in-law. Instead, however, once Katyal disclosed that he had discarded the paper with the interest calculations, Railan informed Katyal that there was no agreement and that Railan had decided to foreclose on the note.[10] The question is whether Railan's actions suspending the writing of the note until that evening and subsequent refusal to commit the agreement to writing was a fraudulent act responsible for the lack of a signed writing that would otherwise support a contract.

Even if we were to consider, as the trial court did, that Katyal's testimony permitted the jury to find that Railan induced him not to reduce their agreement to writ-

---

10. Katyal's testimony on the subject is not entirely clear:

> So, we sat down and he says, [sic] Mr. Katyal, my lawyer, you know, that I had bought that loan and things and my lawyer has advised me, but there is a customary letter you have to give me that I had purchased this loan for that much and—and that much was the loan, you know. I said, you know, I don't have objection to sign it. What about my note? He says, let me write that and I can—we can work on that note also.

> So he wrote that letter with his hand that he did purchase the note from the bank and things and I sign it.
> So, we started, you know, there was a yellow pair of something or sheet, he was start writing [sic] how much would be mine and a half percent for four hundred fifteen thousand dollar.... And I says you want to write that note with hand [sic] too? He says no, why don't you come to my home this evening? I like to write [sic] this note in front of my father-in-law and my wife.

ing, we are constrained to conclude that it would not make a difference as a matter of law because the incident to which Katyal testified occurred one week *after* Railan had already purchased the note from the bank. At that point, Railan was the note holder and had the right to foreclose on the defaulted note.

In *Landow v. Georgetown–Inland West Corp.*, 454 A.2d 310 (D.C.1982), we upheld summary judgment based on a bar of evidence of an oral modification extending a written contract based on the statute of frauds, explaining that:

> An oral agreement to purchase land is taken out of the Statute of Frauds only when the purchaser has changed his position so materially that unless the oral contract is enforced, fraud will result. Mere refusal to perform an oral contract within the statute does not generally constitute such fraud as to raise the estoppel. In order to effectively assert estoppel, the promisee must be able to show that he has changed his position substantially for the worse and that he has incurred unjust and unconscionable injury.

*Id.* at 313–14 (internal citations omitted).

In *Landow*, the purchaser submitted claims for incurred expenses, but the court held that the purchaser failed to demonstrate that the damages were incurred due to the seller's inducement to perform under the oral agreement. *See id.* at 314. In this case, Katyal and Railan began discussing a deal for the Tandoor restaurant property bank note at a party that allegedly took place in the late fall of 1993 or early in 1994. Katyal's testimony is that Railan told him not to worry, that he would buy the note from the bank and give Katyal two years to pay it back; Parden, the bank loan officer, testified that others had expressed an interest in buying the

note more than nine months before Railan purchased it from the bank. Although, as we discuss below, those statements may suffice to constitute fraud in the inducement, they are irrelevant to the statute of frauds inquiry, whether the fraud was responsible for the non-existence of the required writing. Railan's alleged fraudulent action in refusing to commit to writing came after he had already purchased the note and had the right, as noteholder, to foreclose. As in *Landow*, therefore, Katyal's damages might have been incurred regardless of Railan's actions. Therefore, because the instant situation does not come within the exception for fraud-based failures to have a writing, enforcement of the oral contract is precluded by the statute of frauds.[11]

## V.

### Fraudulent Misrepresentation

■ We next address the Railans' argument that the judgments for fraudulent misrepresentation should be reversed because the Katyals failed to present clear and convincing evidence of each required element of fraud. In order to prove fraudulent misrepresentation, the Katyals must prove "(1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action taken by [the Katyals] in reliance upon the representation, (6) which consequently resulted in provable damages." *Dresser v. Sunderland Apartments Tenants Ass'n, Inc.*, 465 A.2d 835, 839 (D.C.1983) (citing *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C.1977)). The elements must be proved by clear and convincing evidence. *See Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C.1992). In applying the law to the evidence presented in this case, we deal

---

11. In view of our holding, we need not address the sufficiency of the evidence tying Dr. Railan to the oral contract, the evidentiary support for contract damages, the trial court's exclusion of evidence of the meeting involving the Katyals' lawyer, Mr. McCants, or the motion for a new trial, to the extent that they relate to the jury's verdict on breach of contract.

separately with the verdicts against Mr. Railan and Dr. Railan.

■ We conclude that there was no error in the trial court's denial of judgment as a matter of law on the jury's finding that Mr. Railan engaged in fraudulent misrepresentation. Here, the jury was presented with sufficient evidence from which it could find, by clear and convincing evidence, that Mr. Railan fraudulently induced Katyal to reject identified offers to buy the note from Union Bank and terminate his search for another buyer who would not foreclose on the note and honor Katyal's requested terms. From Railan's reference to these other offers as being made by "loan sharks" and presenting himself as a caring friend of the Katyals, who were desperately seeking a way out of their financial distress, the jury was entitled to infer that he intended to deceive the Katyals into believing that they should deal with him because he was the person who would accept their terms. Mr. Singh, who tried to conciliate the dispute between Railan and Katyal once Railan decided to foreclose, testified that Mr. Railan "nodded" while Katyal recited the terms of their supposed agreement. Although Mr. Railan testified that he did not decide to foreclose on the note until he became aware at the time of purchase that outstanding taxes imperiled his investment in the note, Katyal's testimony was that from the outset he had informed Mr. Railan of the outstanding taxes and that he had a plan to pay them over time. Parden, the bank's loan officer, testified that he too had informed Railan of the outstanding taxes. Parden also testified that just after completing the documentation for the purchase of the bank note, Mr. Railan sought assurances that the "right to foreclose [was] still in place." From this evidence, and the fact that the Railans immediately foreclosed on the note upon purchasing it, the jury, after deciding on the credibility of the disputed testimony, could infer that such had been the plan from inception. In coming to this conclusion, we distinguish the Katyals' reliance on Mr. Railan's early warnings concerning "loan sharks" and assurances of his own benevolent intentions, which we determine to be sufficient to support the jury's verdict on fraudulent misrepresentation, from the absence of detrimental reliance by the Katyals on Mr. Railan's actions in refusing to reduce the oral agreement to writing after he had already purchased the bank note, which we have held to be legally insufficient to come within the fraud exception to the statute of frauds. In the latter case, the Railans, as holders of the note, could decide to exercise their right to foreclose without extracting any concessions from the Katyals. In this case, on the other hand, although the bank had the right to foreclose, it had chosen not to do so, and had been attempting to work with the Katyals to sell the loan on terms that would accomplish their goals as well. Although there is no assurance that the Katyals would have been able to achieve their objective if someone else had purchased the note, the jury could find that they were injured by Railan's misrepresentations which diverted them from their efforts to locate such a purchaser. See *supra* note 1.

■ We come to a different conclusion with respect to the judgment against Dr. Railan. Mr. Katyal testified at trial that he did not think that Dr. Railan committed any fraud on him. The Katyals respond, however, that the jury could find Dr. Railan liable on an agency theory, relying on her husband's conduct on her behalf:

> Whether an agency relationship exists is a question of fact for which the person asserting it carries the burden of proof.... Generally an agency relationship results when one person authorizes another to act on his behalf subject to his control, and the other consents to do so.... [T]his court considers the determinative factor to be the measure of control.

*Smith v. Jenkins,* 452 A.2d 333, 335 (D.C. 1982) (citations omitted).

■ In this case, there was almost no evidence concerning Dr. Railan's actions in the case in chief, and the little evidence there is was Katyal's admission that he did not discuss the terms of the agreement with Dr. Railan and that he did not believe she had defrauded him. The Katyals, who had the burden of proof on the agency issue, presented no evidence that Dr. Railan exerted any measure of control over her husband. Although there is evidence in the record that Dr. Railan negotiated with the bank, along with her husband, concerning purchase of the Katyals' note, and that she was aware of her husband's negotiations with Katyal, see *supra* note 4, there is no evidence in the record that her husband acted as her agent when he negotiated with and represented to Katyal that he would not foreclose on the note. Katyal's belief that it was Dr. Railan who called Mr. Railan in the car when Katyal was first told that they intended to foreclose on the note is too speculative to meet the Katyals' burden on the question of agency. The trial judge denied Dr. Railan's motion for a directed verdict on the ground that "[t]he facts are susceptible to an interpretation that Mr. Railan was handling investments for his family and stumbled through them." The trial court did not make a finding as to whether Dr. Railan exerted control over Mr. Railan and, thus, could not have found that he acted on her behalf. Although "the existence of agency, and its nature and extent, are questions of fact," *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 673 (D.C.1983), the jury here was not instructed on agency theory, see *supra* note 8, and thus, had no direction on the basis on which it could impute the actions of Mr. Railan to Dr. Railan. On this record, we conclude that the trial court should have granted Dr. Railan's motion for judgment as a matter of law on the jury's verdict for fraudulent misrepresentation.

The Railans argue that the damage awards of $50,250 each for fraudulent misrepresentation should be set aside because they are cumulative of the award for breach of contract. As we have determined that the evidence was insufficient to support the verdict of fraud against Dr. Railan, the related damage award against her also must fail. As we have concluded that the finding of breach of contract, and its corresponding damages award, must be set aside as a matter of law, there is no basis for the argument that the damage award for fraud against Mr. Railan was cumulative. This leaves the argument that there was no evidence supporting such compensatory damages.

■ As we have discussed, the injury to the Katyals from Mr. Railan's fraud was loss of the possibility of avoiding foreclosure by identifying a purchaser for the note who would forbear from such action. The Katyals introduced evidence that once the foreclosure proceedings were announced, they lost business profits of approximately $96,000 [12] and rental income totaling about $75,000. On appeal, the Railans challenge, in their reply brief, the adequacy of the Katyals' proof of lost business profits.[13] *See Garcia v. Llerena*, 599

12. Mr. Katyal testified that, prior to foreclosure, the Tandoor restaurant had income of $10,000 a month, plus an additional $5,000–6,000 a month from its catering business. According to Mr. Katyal, after the foreclosure these amounts were reduced to $6,500 and $1,000, respectively. The Railans' lawyer objected initially, when Katyal was asked "the amount of business you lost as a result of foreclosure". The trial court sustained the objection, noting that it had previously ruled that the Katyals could prove lost income from the business if they "buil[t] it up from the bottom, brick-by-brick, but not have the whole sum in the estimation of the witness." The questioning resumed with more specific questions directed to Mr. Katyal, and counsel did not object again as Mr. Katyal detailed his income, both before and after foreclosure, from his catering and restaurant businesses.

13. In their opening brief, the Railans generally asserted that "there is absolutely no basis in the record" for the jury's award of compensatory damages for fraud, without distinguishing between the evidence presented of lost profits and lost rental income. As to the latter, Mr. Katyal testified at trial that, as a

A.2d 1138, 1144 (D.C.1991) (proof of damages speculative where claimant "did not lay any foundation or identify any source for the formula" used to estimate net return on gross business receipts). Even assuming that we were to consider that belated claim on appeal, *but see George Washington Univ. v. Waas,* 648 A.2d 178, 182 n. 6 (D.C.1994), our review of the record reveals that the issue was not preserved in the trial court.[14] We therefore review only for plain error. *See United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (for plain error, error must be obvious and so clearly prejudicial to appellant's substantial rights as to jeopardize the very fairness and integrity of the trial). In light of the unobjected evidence that was presented of lost rental income in the amount of approximately $75,000, see *supra* note 13, we conclude there is no injustice requiring reversal of the jury's award of $52,500 against Mr. Railan to compensate for proven damage resulting from his fraud.

## VI.

### Punitive Damages

The Railans contend that the award of punitive damages must be set aside because there was no evidence of malice or ill will. Because we conclude that there was no basis for a verdict against Dr. Railan on fraudulent misrepresentation, the award of punitive damages against her, perforce, must be reversed. *See Bernstein v. Fernandez,* 649 A.2d

1064, 1067 (D.C.1991). Punitive damages may be awarded "only if it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages." *Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 938 (D.C.1995), *cert. denied,* 519 U.S. 1148, 117 S.Ct. 1080, 137 L.Ed.2d 215 (1997). In cases where the underlying tort has been fraud, we have required, for punitive damages, that the tort be "aggravated by evil motive, actual malice, deliberate violence or oppression." *Feltman v. Sarbov,* 366 A.2d 137, 141 (D.C.1976) (quoting *Price v. Griffin,* 359 A.2d 582, 589 (D.C.1976)). The Katyals argue that fraud implicitly requires a finding of malice and ill will sufficient to support punitive damages. *See Mark Keshishian Sons, Inc. v. Washington Square, Inc.,* 414 A.2d 834, 842 (D.C.1980); *Harris v. Wagshal,* 343 A.2d 283, 288 (D.C.1975); *District Motor Co. v. Rodill,* 88 A.2d 489 (D.C.1952). Our more recent cases on the subject make clear, however, that evidence over and above what is required to establish the underlying tort is necessary for punitive damages. *See Jonathan Woodner Co.,* 665 A.2d at 938. The jury was instructed in this case that punitive damages could be awarded "only if ... the plaintiff has proven by clear and convincing evidence that the defendant acted with malice and with willful, wanton or reckless disregard of the plaintiff's rights." See *supra* note 6. We presume that this instruction, which accurately reflects the

result of the foreclosure, he lost income from his leases of part of the building premises. The lease with TCBY, a frozen yogurt franchise, which was introduced into evidence without objection, called for rent payments of $3,357 per month for eighteen months, which Katyal had agreed to reduce to $2,300 per month because the tenant was having financial difficulties. In addition, Katyal rented rooms to Georgetown University students and other individuals for a total of approximately $3,300 a month. Three leases with unexpired periods of ten months with these individuals were introduced into evidence without objection. The reply brief does not challenge the

adequacy of the evidence of lost rental income.

**14.** As noted, the Railans' counsel apparently acceded to Mr. Katyal's testimony detailing his lost business profits. See *supra* note 12. In closing, counsel did not address at all the claimed damages resulting from the fraud, focusing only on the issue of liability, even though the Katyals' counsel had displayed a chart detailing the various categories of damages. The record on appeal does not indicate that the Railans objected to the trial court's instructions on compensatory damages.

proper standard, was followed by the jury. The Katyals introduced evidence that, during the course of negotiations concerning the Railans' purchase of the bank note, Mr. Railan presented himself as the caring younger member of a close-knit Indian community acting to protect Katyal, who was ailing both physically and financially, from unscrupulous loan sharks. Railan went so far as to call Katyal his "brother." [15] This evidence, though slight, when viewed in the light most favorable to the Katyals, permits a reasonable jury to find that Mr. Railan not only committed fraud, but also acted with the requisite malice, exploiting their friendship with the result that the Katyals' self-made business [16] was ruined. Thus, it was not error to refuse to set aside the jury's award of punitive damages. *Cf. Boynton v. Lopez,* 473 A.2d 375, 377–78 (D.C.1984) (holding evidence insufficient to support punitive damages, even though there was intentional misrepresentation, where the record "devoid of evidence" showing willful or outrageous conduct or gross fraud, and where the fraudulent party did not benefit financially from the misrepresentation).

## VII.

### New Trial

■■■■■ Railan argues that he was entitled to a new trial on the fraud count. A ruling on a motion for a new trial is committed to the sound discretion of the trial court and, because the trial court has had the benefit of seeing and hearing the trial evidence, the trial court's ruling "will be reversed on appeal only if that discretion has been abused." *Oxendine v. Merrell Dow Pharms. Inc.,* 506 A.2d 1100, 1110 (D.C.1986), *cert. denied,* 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990). A motion for a new trial requires "consideration of all the evidence, both favorable and unfavorable." *Lyons v. Barrazotto,* 667 A.2d 314, 324 (D.C.1995) (internal quotations and citations omitted). In making its determination, the trial court should take care not to set aside a jury verdict only because it would have reached a different result. *See id.* at 325. "Such motions should be granted only if the verdict is against the great—not merely the greater—weight of the evidence." *Id.* at 328–29 (internal quotations and citations omitted). Railan's argument is that the trial court did not expressly assess the weight of the evidence relating to the fraud count and the requirement that the plaintiff prove the elements of fraud by clear and convincing evidence in considering the post-trial motion for a new trial. Railan further argues that a new trial is warranted because the trial court erred in excluding relevant testimony which would have shown that he was equivocal about doing a deal with the Katyals on the note due to the trial court's mistaken belief that the parties had agreed that the testimony would not be permitted because it involved the Katyals' trial attorney, Mr. McCants.

■■■■■ An appellate court's scope in reviewing the trial court's decision not to grant a new trial is more limited than the latitude accorded to a trial judge in deciding the motion. *See Fisher v. Best,* 661 A.2d 1095, 1098 (D.C.1995). In this case, we cannot say that the trial court abused its discretion in deciding that a new trial was not warranted. Although it is true, as Railan argues, that the trial court expressed the view that he, or another jury, could have come to a different conclusion, that is not, as Railan acknowledges, the appropriate standard to be applied by the

---

**15.** Katyal testified that he and Railan became "very friendly," and that Railan told him at one point that "you're my brother now so I cannot charge you" for Dr. Railan's medical treatment, and that Railan referred to him as "bisop," which means "brother or big brother."

**16.** Katyal testified that he came to the United States from India at the age of 21 and worked as a busboy, waiter and assistant manager, subsequently opening a Tandoori restaurant in Georgetown, which was named "one of the ten best restaurants among 5000 restaurants for eight or nine years continuously."

trial court. Rather, Railan seizes on the trial court's statement that the "evidence presented to the jury was not *clearly* weighted in favor of either side" as conclusive on the issue whether the jury's verdict of fraud, which had to be proved by clear and convincing evidence, was against the great or clear weight of the evidence, entitling them to a new trial. We do not so read the trial court's remark. An important part of this case was who the jury believed. Consideration of a new trial motion is not an exercise in supplanting the jury's assessment of the credibility of witnesses. From the jury's verdict it is clear it believed the Katyals' version of events, and found serious fault with Railan's conduct toward Katyal during the negotiations. This is not a case where the jury verdict is undermined by documentary or other "objective" evidence that the trial court could consider the jury overlooked. Nor do we think that the trial court's exclusion of testimony concerning a meeting at which Mr. McCants was present, even if erroneous, would require a new trial. The testimony that Railan represents would have been presented if the evidence had not been excluded is by and large cumulative of other evidence, which the jury already had before it, that Railan was ambivalent about purchasing the note on the terms Katyal alleges. Moreover, McCants would have contradicted Railan's account of the meeting. Thus, we conclude that the trial court did not abuse its discretion in denying the motion for a new trial on the fraud count.[17]

## VIII.

### Counterclaim for Deficiency Judgment

Finally, the Railans contend that the trial court erred in denying their claim for a deficiency judgment in the amount of $150,000, the difference between the face amount due on the note and the purchase price for which they acquired the Tandoor property at foreclosure. The Railans argue on appeal that, as noteholders, *they* were entitled to a deficiency judgment.

■ We first must address a procedural point. The parties had agreed that the trial court should decide the landlord-tenant and deficiency judgment claim based on the jury's verdict, and the trial court did so, denying the deficiency judgment because the Katyals had prevailed. The Katyals contend that the Railans' counsel waived the opportunity to press their claim for a deficiency judgment after the jury returned its verdict. Again, in the post-trial motion the Railans presented no evidence in support of their counterclaim for a deficiency judgment, choosing, instead, to press the claim for possession in the landlord-tenant action. On appeal, the Railans abandon their arguments concerning the action for possession (the Katyals left the premises), but raise the issue of the deficiency judgment. Even if we give the Railans the benefit of the doubt because their counsel's concession was based on the premise that they had "lost" on the jury verdicts (which we partially reverse today), we do not believe that the law compels a deficiency judgment in this case where the jury found that Mr. Railan's fraudulent conduct injured the Katyals by causing the foreclosure of their property. As we do not disturb that verdict, under these circumstances, Mr. Railan should not be permitted to collect the deficiency judgment which would result from his wrongful conduct in foreclosing on the property.

We are not persuaded by the argument that, having chosen to pursue a claim for contract damages against the Railans, rather than seek specific performance to avoid foreclosure, the Katyals have affirmed their obligations to the Railans under the note. The parties have cited no case directly on point and we have found none in this jurisdiction. The Railans premise their argument on the proposition that "[f]or a wrongful foreclosure, the bor-

---

17. In view of our reversal of the judgment on the breach of contract count, we need only address the motion for a new trial as it relates to fraud.

rower has alternative and inconsistent remedies," an action at law for damages or an action in equity to set aside the wrongful foreclosure. *National Life Ins. Co. v. Silverman,* 147 U.S.App.D.C. 56, 62–63, 454 F.2d 899 (D.C.1971), *quoted in Johnson v. Fairfax Village Condo. IV Unit Owners-Ass'n,* 641 A.2d 495, 507–08 n. 25 (D.C.1994). Those cases, however, consider the issue in terms of whether the claimant is entitled to a jury trial once an election of remedies has been made. They do not address the issue before us. The Railans also rely on *Cusimano v. First Md. Sav. & Loan, Inc.,* 639 A.2d 553, 556 (D.C.1994), in support of the claim for a deficiency judgment. As the Katyals correctly note, however, *Cusimano* did not consider the propriety of entering a deficiency judgment in favor of a party who had been found to have fraudulently foreclosed, rather the court in *Cusimano* addressed contract interpretation issues in the context of a party who had lawfully foreclosed.

More instructive, although also not directly on point, is *United Secs. Corp. v. Franklin,* 180 A.2d 505, 510 (D.C.1962), in which the trial court had entered judgment for fraud in favor of a defrauded party to a contract and a deficiency judgment in favor of the defrauding party who sued to enforce the contract. The defrauding party appealed, claiming that the two judgments were inconsistent, and argued that the defrauded party, by its conduct, had affirmed the contract. The defrauded party did not appeal and the issue of the propriety of the deficiency judgment *vel non* was not before the court. On appeal, the court held that on the assumption that the defrauded party had affirmed the contract, "such affirmance or ratification only precluded [it] from subsequently seeking rescission of the contract" and required it "to perform according to its terms." *Id.* at

510. The court further held that having affirmed the contract, the defrauded party could nonetheless sue in tort for fraud, finding "no inconsistency between affirmance and an action in tort for fraud in the inducement [of the contract]." *Id.*

The appeal before us is complicated by the fact that it involves two different contracts: the oral contract that the Katyals alleged existed between them and the Railans in the event that the Railans purchased the bank note which they sought to enforce, and the note that the Railans purchased from the bank. We have rejected the former as violative of the statute of frauds.[18] Further, the Railans deny the existence of the contract that the Katyals alleged. Instead, the Railans' claim for a deficiency judgment arises under the Katyals' promissory note to the bank, which the Railans purchased and which they are seeking to enforce. As the Railans argue in defending the fraud claim, the right to foreclose under the note was independent of their separate negotiations with the Katyals and they succeeded to that right upon their purchase of the note from the bank. Although there is no question that the Katyals signed the note and would be liable for a deficiency if the bank had lawfully foreclosed, under the circumstances of this case, we consider it appropriate to consider the connection between Mr. Railan's fraud and the foreclosure that led to the deficiency. As the court stated in *United Secs. Corp.,* "[s]ince it was [the noteholder's] wrongful act which prevented further performance by [the obligors] under the contract, to require them to pay the total finance charge would unfairly penalize them and confer a benefit on the [fraudulent noteholder]." *Id.* at 511–12. We apply the same reasoning here, which is consistent with other situations in which we have denied a wrongdoer the benefit of wrongful action.[19] We are cognizant, how-

---

**18.** As noted earlier, the judgment we affirm on the Katyals' claim of fraud, sounding in tort, against Mr. Railan is not inconsistent with their contract claim.

**19.** We are not, as the dissent suggests, increasing the amount of damages that the jury awarded to the Katyals for fraud. Rather, we are denying the tortfeasor the benefit of the

ever, that there is no evidence linking Dr. Railan to her husband's fraud. The record does not establish the manner in which the Railans owned the note, and whether their interests are separate or severable. We therefore remand to the trial court for a determination of this issue and a disposition appropriate to their respective interests and liability.

\* \* \* \* \* \*

In conclusion, we reverse the trial court's denial of the Railans' motion for judgment as a matter of law on the breach of contract claim, and remand with instructions that judgment be entered for the Railans on that count. The related compensatory damages for breach of contract are also set aside. We affirm the trial court's denial of the motion for judgment as a matter of law on the fraud claim, and related compensatory ($50,250) and punitive damages ($50,250) against Mr. Railan, but reverse with respect to the judgment on the fraud claim against Dr. Railan (with the related damages awards for compensatory and punitive damages totaling $100,500 against her also being set aside). We affirm the trial court's denial of Mr. Railan's motion for a new trial and its rejection of Mr. Railan's counterclaim for a deficiency judgment. We remand for the trial court to make the necessary findings and enter an appropriate disposition with respect to Dr. Railan's claim for a deficiency judgment.

*So ordered.*

SCHWELB, Associate Judge, concurring in part and dissenting in part:

Although I believe that the Katyals have prevailed by a razor-thin margin with respect to several issues—whether there was clear and convincing evidence of fraud, whether damages were sufficiently established, and, especially, whether punitive damages are warranted, *see, e.g., Feltman v. Sarbov*, 366 A.2d 137, 141 (D.C.1976)—I am prepared to join Parts I through VII of the majority opinion. I must, however, respectfully dissent from the holding that Mr. Railan has somehow forfeited his right to a deficiency judgment.[1]

"[U]nlike rescission, a remedy founded upon equitable principles, the remedy in tort for fraud is based upon the assumption that the fraudulent transaction is to stand." *Millard v. Lorain Inv. Corp.*, 184 A.2d 630, 633 (D.C.1962); *see also United Sec. Corp. v. Franklin*, 180 A.2d 505, 510 (D.C.1962). Here, the Katyals did not seek rescission of the promissory note or of any contractual obligation associated with it. Under their theory of the case, their agreements with the Railans, and especially their obligation under the promissory note, stood, but the Railans were liable to the Katyals in tort for deceiving and defrauding them. Yet the disposition of the case by the majority allows the Katyals to have their cake and eat it too, at least vis-a-vis Mr. Railan. The court holds not only that the Katyals are entitled to an award for fraud—a theory under which the underlying contractual obligation to the noteholder remains in effect—but also that Mr. Railan is precluded from seeking a part of his remedy for the Katyals' breach of their contract to pay the full amount of the promissory note. In effect, by denying Mr. Railan's request for a deficiency judgment, the majority has permitted the Katyals to recover damages for fraud in an amount substantially in excess of the verdict returned by the jury.

In holding that Mr. Railan is barred from pursuing his counterclaim for a defi-

---

bargain he wrongfully procured by foreclosing when he did, contrary to his representation. Here, although the face amount due on the note was $700,000, the Railans purchased the note at a discounted price of $515,000. Upon foreclosing immediately when they purchased the note, the Railans obtained a property that they valued (through their bid) at $550,000–$35,000 more than the amount invested in purchasing the note.

1. I agree with the majority that we should "give the Railans the benefit of the doubt," maj. op. at 1014, with regard to the question whether they have waived their deficiency claim.

ciency judgment while his wife apparently is not so precluded (because "there is no evidence linking Dr. Railan to her husband's fraud," maj. op. at 1016), my colleagues seem to be applying some kind of "unclean hands" reasoning. As I understand the majority's theory, Mr. Railan is precluded from recovering the deficiency because he defrauded the Katyals, and this result is ordained even though the Katyals' claim sounds in tort rather than in rescission, and even though the Katyals have been awarded substantial damages for fraud. But the unclean hands doctrine is a "maxim of equity," while Mr. Katyal's action to recover damages for breach of contract is a "legal claim for money" to which this equitable doctrine has no application. *See, e.g., In re Estate of Barnes,* 754 A.2d 284, 288 n. 6 (D.C.2000) (citations and internal quotation marks omitted). As I see the case, the court is effecting a forfeiture. Forfeitures are not favored, however, *see, e.g., Ass'n of Am. R.R.s v. Connerton,* 723 A.2d 858, 862 (D.C.1999), and I discern no legal basis for ordering one here. I am therefore unable to agree with the majority's disposition of the Railans' counterclaim, and I respectfully dissent from Part VIII of the court's opinion.