**DISTRICT OF COLUMBIA, Appellant,**

v.

**Valentina CHAMBERS, Appellee.**

**No. 07–CV–173.**

District of Columbia Court of Appeals.

Argued May 20, 2008.
Decided Feb. 19, 2009.

Donna M. Murasky, Senior Assistant Attorney General, District of Columbia, with whom Linda Singer, Attorney General at the time the brief was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, Deputy Solicitor General at the time the brief was filed, were on the brief, for appellant.

Kim D. Brooks–Rodney, for appellee.

Before REID, FISHER and BLACKBURNE–RIGSBY, Associate Judges.

REID, Associate Judge:

Appellee, Valentina Chambers, was injured when her van was struck by a vehicle being pursued by a police officer. She brought a personal injury lawsuit against appellant, the District of Columbia, alleging gross negligence by Metropolitan Police Department ("MPD") Officer Theresa Waterhouse, gross negligence by the District in training and supervision, and respondeat superior. The jury returned a verdict in favor of Ms. Chambers, awarding her approximately $950,000.00. The trial court denied the District's post-trial motion for judgment as a matter of law, or alternatively, a new trial. The District contends that the trial court erred by failing to rule, as a matter of law, both before and after the case was submitted to the jury, that the police officer who pursued the vehicle which collided with that of Ms. Chambers, was on an emergency run and the officer was not grossly negligent. We hold that in response to the District's motion, the trial court should have ruled, as a matter of law, that Officer Waterhouse was on an emergency run when Ms. Cham-

bers was injured. However, we reject the District's argument that it also was entitled to a ruling, as a matter of law, that Officer Waterhouse was not grossly negligent. The trial court correctly submitted the gross negligence issue to the jury, but the jury made no finding on that issue since it decided that Officer Waterhouse was not on an emergency run. Hence, we vacate the trial court's judgment and remand this case for a new trial on the issue of whether Officer Waterhouse was grossly negligent in conducting the emergency run.

## FACTUAL SUMMARY

Prior to trial, the District filed a motion for judgment on the pleadings, or in the alternative, for summary judgment. The trial court treated the motion as one for summary judgment, and denied it, explaining that with respect to gross negligence, "[Officer] Waterhouse's speed is an open and significant factual issue" since Mr. Thomas testified during his juvenile proceeding that he was driving "probably about 80" miles per hour, whereas Officer Waterhouse "testified in her first deposition that 'my speed at that point was between 30 ... and 35'" miles per hour. Moreover, "Officer Waterhouse did not explain at her deposition why she did not immediately effect a traffic stop when [Mr.] Thomas first violated the law by running a red light, instead of deciding simply to follow him." The trial court reasoned that if these factual issues were "resolved in favor of [Ms.] Chambers, a reasonable jury could conclude that Officer Waterhouse was grossly negligent."

After the trial court denied the District's motion for summary judgment, the case proceeded to trial. At trial Ms. Chambers presented evidence showing that in the late afternoon of February 3, 2003, around 4:00 p.m., she was driving home from work when her van was hit by another vehicle as she proceeded through the intersection at 17th and A Streets, in the Northeast quadrant of the District of Columbia, at a speed of approximately 15 to 20 miles an hour after having stopped for a traffic signal. She did not see the car before it struck her van, and did not hear any sirens, saw no police lights, heard no horn or squealing tires. Upon impact, Ms. Chambers saw "glass coming towards [her]," and her van started "spinning real fast," and flipped over. She found herself "upside down." The injury to her left hand was severe; her thumb and two other fingers were detached from her hand. Doctors were not able to reattach the thumb and two fingers successfully, and Ms. Chambers has to wear a prosthesis.[1] Following the accident she suffered suicidal thoughts and experienced depression.[2] She lodged a personal injury action against the District.

Since he was unavailable for trial, the trial court permitted Ms. Chambers to present the videotaped deposition testimony of the sixteen-year-old young man, Patrick Thomas, whose automobile collided with Ms. Chambers' vehicle. Mr. Thomas acknowledged that during a hearing on traffic charges against him, he told the

---

1. Ms. Chambers presented the videotaped testimony of her treating surgeon, Dr. James Higgins, and the videotaped testimony of Dr. Konrad Dawson, who performed reconstruction work on her.

2. William Andre Rawls, who described Ms. Chambers as his "best friend," moved in with Ms. Chambers and her son to help with her

personal care, and to assist with the daily chores following the accident. He noticed that "[s]he became frustrated[,] ... depressed[,] ... [and] withdrawn" because she could no longer do certain things and because "her whole life had changed upside down completely."

judge that he was driving around 80 miles per hour at the time of the February 3, 2003 crash. Prior to the collision, Mr. Thomas noticed that a police car was following him as he drove on East Capitol Street. He stopped for a red light and when it changed he drove off "fast" because he had a gun in the car. Initially he drove at a rate of about 50 or 60 miles an hour. The driver of the police car activated "red and blue" police lights (Mr. Thomas did not hear a siren) and followed him at a "fast speed." Mr. Thomas proceeded for about four or five blocks, accelerating to around 80 miles per hour—traveling on East Capitol and 13th Street to 13th or 14th and A to 17th and A. As he drove, he observed that the police officer remained behind him—"probably like a block away, two blocks," but was "chasing" him and moving at a speed of about 50 miles per hour. Mr. Thomas "totaled" the car he was driving, but was able to exit the vehicle and to run away from the scene of the crash. The police caught and apprehended him.

Dr. George Kirkham, a criminologist, testified for the plaintiff as an expert "in the field of police practices and procedures with a specialty in vehicular pursuits." His testimony was based on his review of pertinent documents relating to the case; his familiarity with the route traveled by Mr. Thomas and Officer Waterhouse; and police practices and procedures, including those set forth in: (1) MPD General Order 301.3, "Operation of Emergency Vehicles, Fresh Pursuit and Vehicular Pursuit" (January 13, 1992); (2) General Order 303.1, "Traffic Enforcement" (April 30, 1992); and (3) International Association of Chiefs of Police ("IACP") policy (October

1996). He declared, "within a reasonable degree of professional certainty," that Officer Waterhouse "clearly" was not on an emergency run on February 3, 2003; "she did not believe that it was an emergency or exigent circumstance, situation or a life impairment kind of thing." Rather, Dr. Kirkham asserted, "it was . . . an expired temporary tag," and Officer Waterhouse "even said [ ] she did not even think [ ] it was linked to a stolen vehicle." And, even if Mr. Thomas' vehicle had been stolen, Officer Waterhouse could not have engaged in a "chase under those circumstances," because the applicable police regulation, General Order 301.3, specifies that an officer "cannot chase [ ] in the District for anything other than a serious felony situation," and the officer "is supposed to per regulation [ ] notify her dispatcher immediately [ ] so that word can be put out to other units in the area and a supervisor can get on the air and intervene." Officer Waterhouse failed to notify dispatch immediately, and she did not turn on her "full emergency lights" "until right at or just after the point of impact. . . ."

Dr. Kirkham identified Officer Waterhouse's violations of the police regulation as the proximate cause of the accident between Mr. Thomas' and Ms. Chambers' cars. Moreover, Dr. Kirkham expressed the opinion "within a reasonable degree of professional certainty," that Officer Waterhouse violated "many of the tenets of the national standard of care" as set forth in the International Association of Chiefs of Police (IACP) Vehicle Model Pursuit policy,[3] and those violations were the proximate cause of the accident. Furthermore, in Dr. Kirkham's professional opinion, Officer Waterhouse was grossly negligent,

---

**3.** According to Dr. Kirkham, the IACP Vehicle Model Pursuit policy requires an officer to "consider the urgency of the immediate apprehension and the foreseeability of death or injury." The policy contains "a number of

hazard factors . . . [that an officer should] be aware of," such as "character of the area; time of day; number of people out and about."

that is, she engaged in "grossly and recklessly dangerous actions" on February 3, 2003. When asked the basis for his professional opinion that Officer Waterhouse's actions were the proximate cause of the accident, Dr. Kirkham responded: "[S]he engaged in a series of actions which are widely prohibited by police regulations throughout the country including her own department. They were foreseeable and likely to result in an accident." He explained that the District "is a populous city," and "there are people out and about at all hours." He referenced Officer Waterhouse's testimony "that there would have been school kids out and about at that hour of the afternoon."

MPD Officer Eric Espinosa was called as a witness by Ms. Chambers, and as the District's corporate designee, his testimony was binding on the District. He acknowledged that General Order 301.3, dated January 13, 1992, applied to police pursuits, and General Order 303.1, dated April 30, 1992, pertained to traffic enforcement. Both orders were in effect on February 3, 2003.[4] Officer Espinosa agreed that in the case of a vehicular pursuit, "it would have been a violation of the applicable general order to pursue a car without genuinely believing that someone in the car had committed a serious felony...." Moreover, in the case of a vehicular pursuit, "all of the emergency devices shall be activated at once" (overhead lights and a siren), and the police officer is required to notify the Communications Division of the MPD "as soon as practical." Officer Espinosa further acknowledged that "if an officer were to exceed the speed limit by 10 miles per hour and was not in pursuit of a felon,

that officer would be in violation of [General Order 301.3(b)(5)]." On cross-examination, Officer Espinosa was asked: "[I]f an officer were to observe a traffic violation, what would an officer have to do in terms of the lights and siren to stay in compliance with the general order?" He explained: "Under the traffic regulation, you activate your emergency equipment and attempt to effect a traffic stop." He added that "it would not be unreasonable for an officer to follow behind a vehicle to assess the situation before [he or she] actually activated th[e] emergency equipment." He stated that in the case of a vehicular pursuit, "the applicable general order governing police pursuits supersedes the language in the applicable general order regarding traffic enforcement."[5]

The District called MPD Officer Theresa Waterhouse as a defense witness. According to her direct examination testimony, on the afternoon of the February 3, 2003 crash, she was on duty in her patrol service area, which included 15th and East Capitol Streets. While she was waiting for the light to turn green, she noticed a vehicle with an expired temporary paper tag; the vehicle was driven by Patrick Thomas. She followed the vehicle on East Capitol Street to 14th Street, with her flashing white lights illuminated (position one), and prepared to use the police radio "so that [she] could run the tag [of the vehicle] for investigative purposes." Although the traffic signal was red, the vehicle in front of the officer's car "very hastily" made a left turn onto 14th Street and "continued to pick up speed." Officer Waterhouse waited for the light to turn green,

4. The police pursuit order was revised in late February 2003, after the events in this case.

5. Ms. Chambers called two other experts as witnesses, Dr. Phillip D. Busey, an expert in

the field of vocational rehabilitation, and Dr. Richard Edelman, an expert in the field of economics with a specialty in evaluating economic loss.

and for another vehicle to clear the intersection. As she turned onto 14th Street, she saw the other vehicle make a left hand turn onto A Street, S.E. Officer Waterhouse made the same left hand turn, and noticed Mr. Thomas's vehicle crossing 15th Street without having halted at the stop sign. She did not know how fast Mr. Thomas was driving, but "he was going pretty fast." She did not recall her speed but estimated that it was "25 or 30" miles per hour.[6] The officer believed that Mr. Thomas "had no intentions of stopping for anything at that point," and that she "needed to try to stop the vehicle." However, Officer Waterhouse did not activate her lights and siren, because she did not want the driver "to know that [she] was trying to stop him." Mr. Thomas increased his speed to a "high rate" and drove through the stop sign at 16th Street. By that time, according to Officer Waterhouse, Mr. Thomas "had committed a few traffic violations" and was "now driving recklessly."

Officer Waterhouse activated her lights and siren into position three, meaning that all of the lights illuminated and the siren sounded. Mr. Thomas "made no attempts to slow down." As Officer Waterhouse crossed 15th Street and entered the 1600 block of A Street, Mr. Thomas ignored the stop sign and proceeded to cross 17th Street. His vehicle hit the car which Ms. Chambers was driving; Officer Waterhouse described the impact of Mr. Thomas's vehicle with Ms. Chambers' car as "almost simultaneous[ ]" with the activation of her siren and full flashing lights;

that is, as he "dr[o]ve through the stop sign at 16th and A Street[,][a]lmost immediately he hit [Ms.] Chambers' vehicle." Mr. Thomas got out of his vehicle and ran into an A Street alley. Officer Waterhouse apprehended him and took him back to the scene of the accident.[7]

On cross-examination, Officer Waterhouse acknowledged that the only reason she began to follow Mr. Thomas's car was because of the apparently expired license tag, and that Mr. Thomas's car "was not driving recklessly or erratically before [she] started to monitor it" at 14th and East Capitol, and at that point she "did not believe . . . that [she was] responding to an emergency," or that she "needed to proceed expeditiously or quickly on a mission or to a location in response to an emergency." After the driver turned left onto A Street, the officer followed and she saw him drive through stop signs both at 15th and A and 16th and A, moving "pretty fast." The driver had increased his speed and now was proceeding "at a high rate of speed," and "driving recklessly." At 15th and A Officer Waterhouse decided that she "needed to try and stop the vehicle" and activated her emergency equipment around the time the driver ran the stop sign at 16th and A. She stated that "at the time . . . [she] turned [her] lights in full position, lights and sirens to effect a traffic stop, it was almost immediately that [Mr. Thomas] hit the vehicle" at 17th and A. Counsel for Ms. Chambers sought to impeach Officer Waterhouse but those efforts generally were not directed toward the

---

6.  Upon objection by plaintiff's counsel, the trial court struck this response on the ground that the estimation was "a guess" and as such it was "not admissible."

7.  The District also called as a defense witness Dr. Thomas Green, a psychiatrist who evaluated Ms. Chambers in 2004. His report on

Ms. Chambers showed that he made "three diagnoses . . . [—] post traumatic stress disorder[,] . . . systemic disorder and . . . PCP abuse." On cross-examination, Dr. Green was unable to elaborate on the PCP abuse diagnosis since he could not recall his contact with Ms. Chambers.

issue of whether she was on an emergency run.[8]

The jury verdict form contained several questions, the first of which was: "Do you find that the officer in this case was on an emergency run at or about the time the accident occurred?" The jury answered, "No." The jury, as instructed, then skipped over the second question, relating to gross negligence on the part of the District, to the third one concerning the District's negligence and proximate cause, and found by a preponderance of the evidence that the District was negligent and its negligence was the proximate cause of the accident. In addition, the jury determined that Mr. Thomas's "criminal conduct was an intervening cause of injury to the plaintiff," and that his "conduct was reasonably foreseeable." [9]

After the verdict, the District filed a motion for judgment as a matter of law, or alternatively, for a new trial. Ms. Chambers opposed the motion. In its order, filed on January 24, 2007, denying the District's motion, the trial court stated the principal issue as "whether or not the emergency run question should have been submitted to the jury or whether, as the District contends, it is a question of law which the court should have determined in the District's favor." Relying on our decision in *Duggan v. District of Columbia,* 884 A.2d 661 (D.C.2005) (en banc), the trial court concluded that "*Duggan* itself leaves sufficient room in its analysis for a jury determination of the question in certain

circumstances, although not in the *Duggan* case itself." The court continued, "Such circumstances 'arise only when evidence supports a claim that the operator did not in fact-or did not honestly-believe that [she] should proceed, or was proceeding, on a mission as defined by the statute.'" Order at 4 (quoting *Duggan, supra,* 884 A.2d at 664 n. 1).

The trial court determined that "there is considerable evidence in the record to support" Ms. Chambers' position "that Officer Waterhouse was not on an emergency run at the time of the accident," and that "this case [is] replete with factual and credibility determinations that, in general, fall within the province of the jury":

> The decision implicates considerations such as the speed of the vehicles at various points (the officer testified that she did not know how fast she was driving while on A Street), the character of the neighborhood, the lighting conditions, the intention of the officer in following [Mr.] Thomas in the first place and when, if ever, it changed, and what were the circumstances at the time the officer's intention changed. A reasonable factfinder could have found that the officer, as she testified, intended to effect a traffic stop (not an emergency situation or one requiring expedition) until the actual moment of the accident. That is, she testified that she activated her position three emergency equipment (and thus changed her intention from effecting a traffic stop for dead tags to

8. For example, plaintiff's counsel sought to show differences between Officer Waterhouse's earlier deposition testimony and her trial testimony in at least two areas: (a) at trial Officer Waterhouse said she wrote down the tag number of Mr. Thomas's vehicle completely and tried to call in the number when she was at 14th and East Capitol, but in her deposition she testified she never saw all of the tag numbers and did not call dispatch; (b)

Officer Waterhouse testified at trial that she was certain she had read the General Order on police pursuits because she read it at the academy, but in her earlier deposition she could not say for sure that she had read the order on pursuits.

9. The jury awarded $949,118.00 to Ms. Chambers.

making an arrest for reckless driving) at the very moment the accident was taking place at the next intersection.

Order at 4. The trial court explained its rationale for not removing the emergency run issue from the jury:

> It is not acceptable, in the court's judgment, for a trial court in a jury case to make such intricate and difficult factual determinations-and to weigh the credibility of the key actors (the officer's testimony was repeatedly impeached during trial)-merely because a particular question is generally viewed as a question of law for the court, particularly when the leading authority on the issue leaves ample room for the jury to determine the issue in a case like this.

Order at 5.

## ANALYSIS

■ The District contends that the trial court erred by not resolving the emergency run issue as a matter of law. The District further argues that the jury's "finding that [Officer Waterhouse] was not [on an emergency run] is without any factual basis and legally unreasonable." The District finds alleged error in the trial court's "ruling that whether police conduct qualifies as an emergency run is dependent on the speed of the vehicles, the character of the neighborhood, and the lighting," all of which "are irrelevant to the issue of emergency run...." The District also faults the trial court for "ruling that conduct intending to effect a traffic stop does not constitute an emergency run." The District insists that "[e]ven if it is true that ... evidence would support the finding that Officer Waterhouse did not believe that the circumstances at that moment required even more immediate action than she took, such a finding does not alter

the conclusion that 'at or about the time of the accident' she was on an emergency run." Furthermore, the District argues that as a matter of law, and despite the testimony of Dr. Kirkham, Officer Waterhouse was not grossly negligent given her actions.

In contrast, Ms. Chambers asserts that the District "has failed to demonstrate that the evidence presented at trial was so clear that a reasonable jury could fairly come to but the one conclusion that Officer Waterhouse was on an emergency run at or about the time of accident." She further maintains that "[t]he 'genuine mindset' of Officer Waterhouse at or about the time of the accident at issue is determinative of whether or not she was on an emergency run," and that the officer's own testimony, "if credited by the jury, shows that she did not have an honest belief that she was responding to an emergency until she was in the 1600 block of A Street, NE, where she activated her full lights and siren and Patrick Thomas' vehicle was one block ahead of her in the 1700 block of A Street, NE simultaneously striking [Ms.] Chambers' vehicle." From this testimony, Ms. Chambers declares, "a reasonable jury could conclude that the chain of events and the pursuit leading up to the accident at issue were over such that Officer Waterhouse did not develop an honest belief that she was on an 'Emergency Run' until after the accident had happened and was over, which was too late." In addition, even if Officer Waterhouse was engaged in an emergency run, Ms. Chambers argues that in light of the evidence presented, including that of her expert as well as the District's expert, the trial court appropriately allowed the gross negligence issue to be submitted to the jury.

■ Our review of a motion for judg-

ment as a matter of law is *de novo.*[10] "Judgment as a matter of law may be granted only if, viewing the evidence in the light most favorable to the opposing party, there is 'no legally sufficient evidentiary basis for a reasonable jury to find' for the non-moving party."[11] "This is an exacting standard, and 'it is only in the unusual case, in which only one conclusion could reasonably be drawn from the evidence, that the court may properly grant judgment [as a matter of law].' "[12] In addition, " 'it is the responsibility of the jury (and not the judge) to weigh the evidence and to pass upon the credibility of witnesses.' "[13]

■ Applicable legal principles governing an "emergency run" are found in statute and case law. D.C.Code § 2–411(4) (Repl.2006) defines "emergency run" as follows:

(4) "Emergency run" means the movement of a District-owned vehicle, by direction of the operator or of some other authorized person or agency, under circumstances which lead the operator or such persons or agency to believe that such vehicle should proceed expeditiously upon a particular mission or to a designated location for the purpose of

dealing with a supposed fire or other emergency, an alleged violation of a statute or regulation, or other incident requiring emergency action, or the prompt transportation to a place of treatment or greater safety of an alleged sick or injured person.

Our case law requires a broad interpretation of "emergency run." We articulated this notion in our en banc decision in *Duggan, supra:* "[T]he legislature ... meant the concept of an 'emergency run'—the event that triggers the heightened proof requirement of gross negligence—to be understood broadly.[14] And, in fact, the statute defines the term expansively." A broad and expansive interpretation of § 2–411(4) means that "the 'movement' of the vehicle upon a mission or to a location entails no notions of a 'chase' or a 'hot pursuit'; so long as the operator is 'proceeding expeditiously' in response to what he [or she] believes is an emergency, he [or she] is on an emergency run."[15] Thus, there is no requirement that "the circumstances leading the operator to initiate the emergency run" be "reasonabl[e] or justifiabl[e]"; rather, "[s]o long as they 'lead the operator ... to believe' a 'supposed emergency' requires the action, [the opera-

10. *Brown v. National Acad. of Scis.,* 844 A.2d 1113, 1117 (D.C.2004); *Railan v. Katyal,* 766 A.2d 998, 1006 (D.C.2001).

11. *Railan, supra* note 10, 766 A.2d at 1006 (quoting Super. Ct. Civ. R. 50).

12. *Brown, supra* note 10, 844 A.2d at 1118 (quoting *Homan v. Goyal,* 711 A.2d 812, 817 (D.C.1998)).

13. *Wilson v. Washington Metro. Area Transit Auth.,* 912 A.2d 1186, 1188 (D.C.2006) (quoting *Doe v. Medlantic Health Care Group, Inc.,* 814 A.2d 939, 946 (D.C.2003)).

14. *Duggan, supra,* 884 A.2d at 663. A broad interpretation of "emergency run" is required because of the related provision in D.C.Code

§ 2–412 which generally waives the District's governmental immunity for "a claim ... on account of personal injury or death caused by the negligent or wrongful act or omission of any employee of the District occurring as the result of the operation by such employee, within the scope of his [or her] office or employment, of a vehicle owned or controlled by the District...." However, § 2–412 specifically limits the governmental waiver by mandating "that in the case of a claim arising out of the operation of an emergency vehicle on an emergency run the District shall be liable only for gross negligence." If the police vehicle is not on an emergency run, the District's liability is tested against an ordinary negligence standard.

15. *Id.*

tor] is on an emergency run and his [or her] conduct enjoys the statutory protection against claims for ordinary negligence."[16] In short, in this case, "any rational trier of fact would have to find that [Officer Waterhouse] genuinely believed [she] should pursue [Mr. Thomas] expeditiously, and thus that [she] was on an emergency run."[17]

Even if an officer testifies, as in *Duggan, supra*, that he did not believe he was on an emergency run, his "actions legally ... [may] demonstrate in fact that he believed it necessary to proceed expeditiously in pursuit" of a driver.[18] As we said in *Duggan*, "the fact that [the police officer] answered 'no' on cross-examination to whether he 'consider[ed himself to be] on an emergency run in going after [the defendant]' sheds no light on whether his belief and actions fit the statutory definition."[19] It is not important how the police officer "characterized [his] actions legally"; if his actions "demonstrate in fact that he believed it necessary to proceed expeditiously in pursuit of [the defendant]," then he would be on an emergency run.[20] The circumstances in *Duggan* that led us to hold that the officer was on an emergency run as a matter of law included (1) the car was "driving erratically" when the officer first saw it; (2) the vehicle "jerked" several times suggesting that the driver was having difficulty driving the car or was drinking or the car had a problem; (3) the driver did not stop when the officer turned on his overhead lights and siren but rather drove at a high rate of speed and ignored a red light; (4) the officer notified his dispatcher that the driver was "running from

[him]"; and (6) the officer " 'blast[ed his] sirens,' and kept his overhead lights on to 'let the vehicles traveling east and west know that [an] emergency vehicle was going through the intersection.' "[21]

In allowing the issue of emergency run to go to the jury rather than resolving it as a matter of law, the trial court understandably may have focused on and been misled by footnote 1 in *Duggan* in which we said: "There may ... be circumstances where the issue of whether a vehicle operator was on an emergency run presents a jury issue, but they will arise only when evidence supports a claim that the operator did not in fact—or did not honestly—believe that he [or she] should proceed, or was proceeding, on a mission as defined by statute."[22] From this footnote, the trial court may have concluded that the important inquiry is merely whether the officer believed she was on an emergency run, and not also whether her actions demonstrated that she was proceeding expeditiously and hence on an emergency run. Indeed, the trial court instructed the jury, in part:

> You must conclude that Officer Waterhouse was on an emergency run if you conclude that the officer at the time of the incident had a genuine honestly held belief that she should proceed expeditiously upon a particular mission or to a designated location for the purpose of dealing with a supposed emergency and alleged violation of a statute or regulation or other incident requiring emergency action. There is no requirement that the officer's belief be reasonable in order for you to find that the officer was on an emergency run.

16. *Id.*

17. *Id.* at 664.

18. *Id.*

19. *Id.*

20. *Id.*

21. *Id.*

22. 884 A.2d at 664 n. 1.

What is required is determination that she honestly believed that she should proceed expeditiously on a mission to respond to a supposed emergency.

In addition, the court may have meshed two issues—emergency run and negligence or gross negligence—rather than treating them as separate issues. It appears that the factual issues which concerned the trial court related mainly to negligence or gross negligence. For example, the court reasoned that the emergency run decision "implicates considerations such as the speed of the vehicles at various points (the officer testified that she did not know how fast she was driving while on A Street), the character of the neighborhood, [and] the lighting conditions...." But these factors are relevant mainly to the negligence or gross negligence issue, rather than the emergency run issue.

In determining whether Officer Waterhouse was on an emergency run, the entire period in which she followed Mr. Thomas's vehicle is pertinent. As we declared in *Abney v. District of Columbia*, "the statutory definition [of an emergency run] can only be construed to encompass the entire chase by the police officer ..., [and] encompasses the decision to pursue as well." [23] In this case, it is incorrect to focus only on the cross-examination statement of Officer Waterhouse that when she began monitoring Mr. Thomas's car at 14th and East Capitol Street, she "did not believe ... that [she was] responding to an emergency," or that she "needed to proceed expeditiously or quickly ... in response to an emergency." Rather, the focus must be on the entire, fast-moving scenario and Officer Waterhouse's actions to the moment of the collision. At his traffic proceeding, Mr. Thomas informed the judge that he was driving initially at 50

to 60 miles an hour but increased his rate of speed to 80 miles per hour as the police car followed him. He noticed that the police car was "chasing" him and moving at a rate of about 50 miles per hour. He saw "red and blue" police lights, did not hear a siren, but the police car followed him at a "fast speed." Officer Waterhouse testified that after Mr. Thomas turned left on 14th Street, he "continued to pick up speed"; that when he ran the stop sign at 15th Street, "he was going pretty fast," "had no intentions of stopping for anything at that point"; and that she "needed to try to stop him," but she did not activate her lights and siren at that point because she did not want the driver "to know that [she] was trying to stop him." But when Mr. Thomas drove through the stop sign at 16th Street, driving at a "high rate" of speed and "driving recklessly," Officer Waterhouse activated her lights and siren.

Dr. Kirkham, Ms. Chambers' expert, based his opinion—that Officer Waterhouse was not on an emergency run—on the officer's statement at the beginning of the chase and the fact that the chase began because Mr. Thomas had an expired tag. His opinion was not based on the statutory definition of "emergency run" or the broad interpretation of the term as discussed in *Duggan*. Indeed, much of his testimony addressed the negligence or gross negligence issue rather than the "emergency run" issue.

On this record, we hold that "only one conclusion could reasonably be drawn from the evidence" [24]—Officer Waterhouse was on an emergency run. She was "proceeding expeditiously" in a District-owned police car in response to Mr. Thomas's increased and high rates of speed, his failure

23. 580 A.2d 1036, 1041 (D.C.1990) (footnote omitted).

24. *Brown, supra* note 10, 844 A.2d at 1118.

**16**

to halt at stop signs, and his reckless driving. By following him, concluding that she needed to stop him, increasing her speed and ultimately activating her emergency lights and siren to accomplish her mission of stopping Mr. Thomas because of his recklessness, Officer Waterhouse's actions and belief signaled that she was on an emergency run. Thus, there was "no triable issue of fact,"[25] and the trial court should have ruled, as a matter of law, that Officer Waterhouse was on an emergency run. *See* D.C.Code § 2–411(4); *Dickson; Duggan; Abney, supra.*

In contrast to the evidence relating to the "emergency run" issue, that concerning "gross negligence" involved triable issues of fact, such as whether Officer Waterhouse violated General Order 301.3, the speed at which Officer Waterhouse was traveling, and the character of the neighborhood in which the chase unfolded. Consequently, the trial judge correctly submitted the gross negligence issue to the jury.

Accordingly, for the foregoing reasons, we reverse the judgment of the trial court on the ground that, as a matter of law, Officer Waterhouse was on an emergency run and that issue should not have been submitted to the jury. However, because the jury did not return a verdict on the question of gross negligence, we remand this case for a new trial on the issue of whether Officer Waterhouse "was grossly negligent in the manner by which [she] conducted the emergency run."[26]

*So ordered.*

---

**25.** *Dickson v. District of Columbia,* 938 A.2d 688, 689 (D.C.2007).

**26.** *Duggan, supra,* 884 A.2d at 665.