*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 21-CV-0152 & 21-CV-0163

RACHELLE THORNE, *et al*., APPELLANTS,

v.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2019-CA-006254-V & 2019-CA-006387-V)

(Hon. Jason Park, Trial Judge)

(Argued May 31, 2022        Decided June 26, 2025)

 *Geoffrey A. Allen*, with whom *Vincent A. Jankoski*, was on the brief for appellants.

 *Harrison M. Stark*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia at the time, *Loren L. Alikhan*, Solicitor General at the time the brief was filed, *Caroline S. Van Zile*, Principal Deputy Solicitor General at the time the brief was filed, and *Carl J. Schifferle*, Deputy Solicitor General were on the brief for appellee.

 Before BECKWITH and HOWARD, *Associate Judges*, and GLICKMAN, *Senior Judge.*[*]

---

 [*] Judge Glickman was an Associate Judge at the time of argument. His status changed to Senior Judge on December 21, 2022.

HOWARD, *Associate Judge*:  Appellant Rachelle[1] Thorne, individually and on behalf of her children, and appellant Jeanne Dinga separately filed suit against appellee the District of Columbia (the District) for negligence following a collision between a police cruiser driven by Metropolitan Police Department (MPD) Officer Dallas Bennett and a vehicle driven by Ms. Dinga with Ms. Thorne and her children as passengers.  The cases were consolidated and the District moved for summary judgment in both cases.  The trial court granted the motions after finding that Officer Bennett was on an "emergency run" under D.C. Code § 2-411(4) and concluding that no reasonable juror could find that he was grossly negligent, the standard for finding liability in the context of an emergency run.

On appeal, appellants argue that the trial court erred in granting the motions because: (1) there is ample evidence to conclude that Officer Bennett did not believe he was responding to an emergency and (2) assuming that Officer Bennett was on an emergency run, there is evidence from which a trier of fact could conclude that his actions in precipitating the collision were grossly negligent.  We reverse in part, after reviewing the record in the light most favorable to appellants, because, we conclude that a reasonable jury could decide that Officer Bennett was both not on an

---

[1] Although appellant's name appears as "Rachel" in the briefs filed with this court, the trial court documents and notice of appeal state the correct spelling is "Rachelle."

emergency run and that he acted with ordinary negligence. However, we agree with the trial court that a reasonable jury could not decide that Officer Bennett acted with gross negligence and affirm that determination.

## I.     Background

On May 23, 2019, around 4 p.m., Officer Bennett was driving a police cruiser en route to an assignment with Officers Natalie McClain and Brian Lafranchise as passengers. Officer Bennett exited an alley onto the 3300 block of 13th Street, SE, and collided with a red vehicle driven by Ms. Dinga and with Ms. Thorne and her two children as passengers.

Ms. Thorne filed a negligence suit against Ms. Dinga and the District based on the collision. Shortly after, Ms. Dinga filed a separate negligence suit against the District. The cases were consolidated in the months that followed. The District later filed motions for summary judgment in both cases.

The trial court granted the District's motions. It explained that the undisputed facts establish that Officer Bennett "believed it necessary to proceed expeditiously to the location in response to the Code 2 direct call and that he was acting pursuant to that belief at the time of the collision." The trial court thus concluded that the "record establishes that Officer Bennett was on an emergency run under D.C. Code

§ 2-411(4) at the time of the collision" and "[a]ccordingly, the District may be held liable only upon a finding of gross negligence." It then found that based on the record, "no reasonable juror could find that Officer Bennett acted with wanton, willful or reckless disregard or conscious indifference for the rights and safety of others."[2] This appeal followed.

On appeal, appellants challenge the trial court's grant of summary judgment. First, they argue that there is "ample evidence from which a trier of fact could conclude that Officer Bennett did not believe he was responding to an emergency at the time of the subject collision" based on his testimony and circumstantial evidence. Second, they argue that even assuming that Officer Bennett was on an emergency run, there was evidence from which a trier of fact could conclude that his actions were grossly negligent "in that he failed to activate his emergency equipment so as to alert nearby motorists to his approach and he failed to yield the right-of-way to Ms. Dinga's oncoming vehicle and actually entered her lane as she was lawfully proceeding in the opposite direction."

---

[2] Subsequent to the trial court's order, on March 1, 2021, Ms. Thorne dismissed her claims against Ms. Dinga.

## II. Standard of Review

"Summary judgment should be granted only when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law." *Klock v. Miller & Long Co.*, 763 A.2d 1147, 1150 (D.C. 2000). "A fact is 'material' if its existence 'might affect the outcome of the suit under the governing law,' and a factual issue is 'genuine' if the evidence permits a reasonable jury to find that issue in favor of the non-moving party." *Tillery v. District of Columbia*, 227 A.3d 147, 151 (D.C. 2020). "Summary judgment is improper if there is evidence on which the jury could reasonably find for the nonmoving party." *Armstrong v. Thompson*, 80 A.3d 177, 183 (D.C. 2013).

"In reviewing a grant of summary judgment, this court conducts an independent, *de novo* review of the record in a light most favorable to the opposing party." *Klock*, 763 A.2d at 1149. "Our appellate standard of review is the same as the trial court's standard for initially resolving the underlying motion for summary judgment." *Id.* at 1149-50.

### III. Analysis

### A. Emergency Run

We first consider whether a reasonable jury could find that Officer Bennett was not on an emergency run. "Applicable legal principles governing an 'emergency run' are found in statute and case law." *District of Columbia v. Chambers*, 965 A.2d 5, 13 (D.C. 2009). We begin with D.C. Code § 2-412, which "constitutes a waiver of governmental immunity by the District of Columbia for claims of personal injury or death resulting from the negligent or wrongful operation of a District vehicle by a District employee acting within the scope of his employment." *Duggan v. District of Columbia*, 884 A.2d 661, 663 (D.C. 2005) (en banc). The statute expressly limits the waiver of governmental immunity, providing that "in the case of a claim arising out of the operation of an emergency vehicle on an *emergency run* the District shall be liable only for gross negligence."[3] *Id.* at 663 (emphasis added). "If the police vehicle is not on an emergency run, the District's

---

[3] "In the context of [D.C. Code § 2-411(4)], we have defined 'gross negligence' to require 'such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others.'" *District of Columbia v. Hawkins*, 782 A.2d 293, 300 (D.C. 2001) (quoting *District of Columbia v. Walker*, 689 A.2d 40, 44 (D.C. 1997)).

liability is tested against an ordinary negligence standard." *Chambers*, 965 A.2d at 14 n.14.

D.C. Code § 2-411(4) defines "emergency run" as follows:

> "Emergency run" means the movement of a District-owned vehicle, by direction of the operator . . . , under circumstances which lead the operator or such persons or agency to believe that such vehicle should proceed expeditiously upon a particular mission or to a designated location for the purpose of dealing with a supposed fire or other emergency, an alleged violation of a statute or regulation, or other incident requiring emergency action . . . .

"Our case law requires a broad interpretation of 'emergency run.'" *Chambers*, 965 A.2d at 13. As we have explained, "the 'movement' of the vehicle upon a mission or to a location entails no notions of a 'chase' or a 'hot pursuit'; so long as the operator is 'proceed[ing] expeditiously' in response to what he believes is an emergency, he is on an emergency run." *Duggan*, 884 A.2d at 663. Furthermore, "the circumstances leading the operator to initiate the emergency run need not 'reasonably' or 'justifiably' do so." *Id.* "So long as they 'lead the operator . . . to believe' a 'supposed emergency' requires the action, he is on an emergency run and his conduct enjoys the statutory protection against claims for ordinary negligence." *Id.*

Appellants challenge the trial court's conclusion that Officer Bennett was on an emergency run and argue that there is ample evidence from which a trier of fact could conclude that the officer did not believe he was responding to an emergency. They argue that the trial court erred in "premising summary judgment solely on Bennett's proceeding expeditiously" and assert that "if proceeding 'expeditiously' were the test, every police response would be an emergency run." They argue that the "expeditious movement must be for the purpose of dealing with an emergency" and that if it were otherwise, the statute "would limit liability in all instances where the police were responding to 'any call.'" They assert that the trial court "essentially read out of the statutory definition the necessity for there to be an 'emergency.'"

Viewing the record in the light most favorable to appellants, as we are required to do, we find that a rational trier of fact could have concluded that Officer Bennett was not on an emergency run because he did not genuinely believe that he was proceeding expeditiously to an emergency based on (1) MPD guidance on "Code 2" classifications and Officer Bennett's understanding of this classification; (2) Officer Bennett's understanding of alarm calls in general and on this particular assignment; and (3) his conduct while driving to the assignment. *See Atkinson v. District of Columbia*, 281 A.3d 568, 570 (D.C. 2022) (explaining that the concept of an emergency run "requires 'a genuine—an honestly held—belief by the operator

that [the operator] should proceed expeditiously on a mission or to a location in response to a supposed emergency'" (quoting *Duggan*, 884 A.2d at 663)).

MPD General Order 302-01 (Order), which the District submitted to this court pursuant to D.C. App. R. 28(k), provides important context for Officer Bennett's training regarding the Code 2 assignment to which he was responding. The Order (that would have been in place when Officer Bennett collided with appellants) notes an effective date of April 28, 1981, and states that its purpose is to set forth policies and procedures for processing calls for police service.[4] Part I(B)(2) of the Order provides that all radio assignments "voiced over the air shall be classified as either Code 1 or Code 2 by Communications Division personnel" according to the provided guidelines. It notes that Code 1 classification "shall be given to those requests for police service which report a felony in progress, a misdemeanor in progress where the violator is armed, and all other requests alleging an immediate threat to the safety of a person." Examples provided include a burglary in progress, a robbery in progress, and an officer in trouble. Code 2 classification "shall be given those calls for police service which do not pose an immediate threat to the safety of any person."

---

[4] MPD General Order 302-01 with an effective date of February 16, 2022, was also attached. We do not find this later Order relevant to our analysis because the effective date is more than two years after the collision in this matter in May 2019.

Examples provided include "[a]ny call received as the result of a mechanical, electric, or recorded alarm," fire alarms, and traffic accidents.

In terms of responding to calls for service, Part C of the Order indicates that "primary units" responding to a Code 1 shall respond "directly to the reported location for service by the most direct route, using appropriate emergency warning devices to assist in a safe and swift response to the reported emergency." For Code 2 assignments, the Order indicates that units selected to respond to these assignments "shall respond to the location of the call for service by the most direct route, complying with the traffic regulations of the District of Columbia, and shall not use emergency warning devices."

At his deposition, Officer Bennett testified that the assignment was an "alarm call" for a property in the 1200 block of Trenton Place, SE. When asked whether the dispatcher instructed him to treat the call as an emergency, Officer Bennett replied, "[w]e were told Code 2." When asked to explain a Code 2, Officer Bennett said, "Code 1 is lights and sirens; Code 2, you don't have your lights and sirens on; however, you respond expeditiously, and you take the most direct route to the call." He further explained that when responding to a Code 1, "lights and sirens go on, we activate our body-worn camera and we respond with . . . the utmost regard of human life, obeying all traffic laws." He later clarified that when responding to Code 1

assignments, officers are exempt from speeding regulations and are allowed to go a certain amount over the speed limit. However, with stop signs, red lights and intersections, officers "come to a stop[.]" When asked if Code 1 is an emergency run, Officer Bennett replied "[y]es, emergency and Code 1 are hand-in-hand, yes." Based on Officer Bennett's testimony describing and contrasting Code 1 and Code 2 assignments, a reasonable jury could have concluded that he generally understood that Code 1 assignments indicated an emergency situation whereas Code 2 assignments did not.

In terms of alarm calls in general, a reasonable jury could have found that Officer Bennett did not believe these typically constituted an emergency and that his testimony did not indicate a belief that this particular call was an emergency. When Officer Bennett was asked "[g]enerally speaking, what kinds of things are occurring when alarms go off[,]" he testified that, "[i]t's an accidental alarm set off by either the owner or by some faulty electronics" and that dispatch or someone at the scene updates officers on whether it was an accident. When asked whether residential alarms go off accidentally a lot, Officer Bennett replied, "[y]es." He noted that officers are not allowed to make stops when responding to an alarm call because the call is "still urgent" and though it "may not be Code 1, lights and sirens," it is "still Code 2 direct."

With respect to this particular assignment, Officer Bennett could not recall whether the alarm was at a residential or business location. He also could not recall whether the dispatcher had told him that an active burglary was taking place and there is no record evidence indicating that the call was for an active burglary. Based on the record and upon review of the MPD General Orders, which indicate that an active burglary would be characterized as a Code 1 assignment, a reasonable jury could have inferred that this particular call was not for an active burglary and that Officer Bennett's testimony did not indicate he believed otherwise.

Finally, a reasonable jury could have concluded that Officer Bennett's conduct did not demonstrate that he was on an emergency run. Officer Bennett testified that right before the collision, he was traveling in the alleyway at the speed limit, which he believed was about fifteen miles per hour, and came to a full stop at the intersection of the alley and 13th Street, which has two undivided lanes with one going in each direction. A vehicle was parked on his right that only allowed him to see two car lengths ahead and he had to inch out of the alley to proceed further down the street. He testified that after coming to a stop, his "intention was to turn right onto 13th Street." He then looked both ways and when he looked left, he "witnessed a . . . silver/gray car traveling from left to right" going about twenty-five miles per hour. This car was "about five car lengths to [his] left, traveling to [his] right."

Officer Bennett did not activate his siren or emergency lights and after the silver car passed, he "proceeded to turn right onto 13th Street, by cutting [his] wheels sharp to the right." He said, "I took a brief look to the left, to make sure there were no cars in the lane I was entering, and as I was making the turn, I looked ahead of me, which is when I saw the red vehicle." He estimated about five to ten seconds elapsed between the time that the silver vehicle passed him and the point at which he saw the red vehicle, Ms. Dinga's car, for the first time. The collision occurred immediately thereafter.

Considering the entire period that Officer Bennett was driving to the alarm call to the point of the collision under our standard of review, the record does not strongly demonstrate that he held the belief that the call was for an emergency nor does it provide circumstances that could only be interpreted as prompting him to determine that the alarm call was an emergency. *See Dickson v. District of Columbia*, 938 A.2d 688, 690 (D.C. 2007) (explaining that, given the evidence of the circumstances leading Officer Flynn to believe he should assist another officer— his training to immediately respond to a radio call of an outnumbered officer at a traffic stop—"a finding by a trier of fact that Flynn was merely feigning or staging an emergency run . . . would have rested on surmise").

There is also no record evidence indicating that Officer Bennett was involved in a quickly evolving scenario, such as an officer following an erratic or speeding driver, which would have prompted him to believe the situation had become an emergency. *See Chambers*, 965 A.2d at 15-16 (determining that as a matter of law, an officer's actions and belief signaled she was on an emergency run because she was proceeding expeditiously "in response to [a driver's] increased and high rates of speed, his failure to halt at stop signs, and reckless driving" though the officer only activated her lights and sirens at the very last moment of the pursuit); *Duggan*, 884 A.2d at 664 (concluding that an officer was on an emergency run, although he testified to the contrary, because his actions "demonstrate in fact that he believed it necessary to proceed expeditiously in pursuit of [a driver] after seeing him 'jerk' his vehicle several times, accelerate and go through a red light, and 'run[] from' the signaling officer").

In short, the evidence regarding Officer Bennett's conduct while driving to the assignment did not indicate the hallmarks of an officer proceeding expeditiously to a supposed emergency and, lacking testimony from Officer Bennett that he believed he was responding to an emergency, a reasonable jury could have found that he was not on an emergency run. *See Duggan*, 884 A.2d at 664.

## B.     Negligence

Having concluded above that a reasonable jury could conclude that Officer Bennett was not on an emergency run, the District's liability could then be determined either by application of the gross negligence standard or ordinary negligence standard, depending on the jury's actual answer to the emergency run question.  *Chambers*, 965 A.2d at 14 n.14.  In short, we are convinced that a reasonable jury could find ordinary negligence, but not gross negligence.  We will address ordinary negligence before gross negligence.

### 1.  Ordinary Negligence

The trial court did not consider whether a trier of fact could find simple negligence.  Viewing the summary judgment evidence in the light most favorable to appellants, however, we find that a reasonable jury could find liability on this standard based on (1) Officer Bennett's contradictory testimony, photographic evidence, and testimony by Ms. Dinga and Ms. Thorne, which contradicts Officer Bennett's testimony; (2) a witness statement prepared by Officer Bennett shortly after the accident that does not reference Ms. Dinga being in the officer's lane; and (3) a traffic crash report contradicting Officer Bennett's testimony,

prepared by responding officer Sergeant Corey Vullo, Officer Bennett's patrol service area sergeant, who arrived at the scene of the collision.[5]

Officer Bennett testified that, prior to turning onto 13th Street, where the collision occurred, he was in an alleyway and stopped and looked both ways at the mouth of the alley. He then saw a silver vehicle traveling in the direction he intended to turn and waited for it to pass before turning. At the point that he turned he could see about five car-lengths back, but could not see incoming traffic beyond the silver vehicle. Officer Bennett testified that when he first observed Ms. Dinga's vehicle, it was not in its correct lane and was "in the [right-hand] lane in which [he] was traveling in." When asked if Ms. Dinga's vehicle had veered into his lane as he was making his right turn, he said "correct." When asked how far into the turn he was when he first saw her car, he explained that he was already behind the silver car and was "almost clear of the car parked right next to the alley." He testified that it was

---

[5] Neither party has made challenges to the admissibility of the summary judgment evidence that we see on the record in front of us nor do we discern any related findings from the trial court. *See* Super. Ct. Civ. R. 56(c). As such our consideration does not reach the admissibility of any of the unchallenged summary judgment evidence, which will be the province of the trial court when a party sponsors evidence for trial. The only evidentiary challenge we see on the record is to the value of the MPD Crash Review Board's conclusions in its report after review of the incident. Appellants preemptively assert that the report and the District's responsive action constitute an admission of a party opponent, relying on *Nunnally v. Graham,* 56 A.3d 130, 139 (D.C. 2012). Appellee disputes the evidentiary value of the report on appeal, based upon a factual inaccuracy as opposed to inadmissibility. We did not rely on that report in reaching our conclusions.

"a split second" between the point he saw Ms. Dinga's vehicle and the collision occurred.

However, Officer Bennett also testified that the rear of the silver vehicle had just passed the center of the red car, Ms. Dinga's car, when the collision occurred. Given that all of these vehicles were driving on a narrow, undivided-lane road with cars parked on either side—by Officer Bennett's own testimony, it seems highly improbable, at best, that Ms. Dinga could have been in his lane. Further, taken with the turn radius of a large sedan like the police cruiser, a reasonable jury could determine that Officer Bennett blindly turned into oncoming traffic.

Officer Bennett also testified that after the collision, Ms. Dinga's vehicle "continued traveling down the roadway several tens of yards" and that when it came to a halt it was "in the center of the road." However, the District's exhibits 12 and 13 to the summary judgment motion, are photographs showing Ms. Dinga's car damaged and in its lane. And the District's exhibits 9, 10, and 11, show the police cruiser, after the collision, fully out of the alley and crossing the middle of the narrow street, even after being pushed back by the collision.

Finally, Officer Bennett testified that he filled out a witness statement about an hour after the collision. In the statement he noted that he was responding to a residential alarm call when he saw a red car "traveling straight toward [his] vehicle

at a high rate of speed" and that he attempted to apply his brakes but the vehicle was "already too close." The statement does not mention Ms. Dinga's vehicle swerving into Officer Bennett's lane.

At her deposition, Ms. Dinga testified that she and Ms. Thorne were friends and that on the day of the accident she and Ms. Thorne had driven to pick up Ms. Thorne's children from school. They were headed to Ms. Thorne's residence and had no other plans for the evening aside from getting food. Ms. Dinga testified that it was raining and that she had her headlights on and that she was driving "[n]o more than 20 miles" per hour. She testified that she was "driving with precaution" because she had children in the car and it was raining. Before the impact, Ms. Dinga testified that she did not swerve her car, contradicting Officer Bennett's testimony. She also testified that she did not see anything before the impact. She testified that after the impact, she hit her brakes and did not change the direction of her vehicle.

Ms. Thorne testified at her deposition that Ms. Dinga was "driving with caution because it was raining." When asked if she was concerned about running into any of the cars parked on the side of the street closest to her, Ms. Thorne said "[n]o, I was not." She testified that immediately before the accident, she saw an oncoming vehicle but did not see or hear the police cruiser before the collision.

A traffic crash report compiled by Sergeant Vullo, who was Officer Bennett's patrol service area sergeant and investigated the scene of the accident, also makes

no reference to Ms. Dinga swerving or speeding and instead notes that Ms. Dinga's motor vehicle action was "[e]ssentially [s]traight [a]head." The report also notes that Officer Bennett failed to yield right-of-way at the time of the crash.[6] Taken together, this record evidence viewed in the light most favorable to appellants contradicts Officer Bennett's account of the accident, specifically his assertion that Ms. Dinga veered into his lane, and a reasonable jury could conclude that the collision was caused by his negligence.

## 2. Gross Negligence

However, taking the facts described above, we agree with the trial court that no reasonable jury could find gross negligence, and thus the government was entitled to partial summary judgment on the issue whether Officer Bennett was grossly negligent.

Gross negligence requires "that the conduct of the MPD officers so grossly deviated from the conduct required under the circumstances as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others." *District of Columbia v. Henderson*, 710 A.2d 874, 876 (D.C. 1998) (quoting *District of Columbia v. Walker*, 689 A.2d 40, 44 (D.C. 1997)). "We have explained that a finding of gross negligence, if such standard is to be meaningfully

---

[6] Officer Bennett testified that Sergeant Vullo took pictures at the scene but did not ask him what had happened.

distinguished from simple negligence, must demand serious aggravating factors in a party's conduct beyond those necessary to establish simple negligence in the first place." *Lynch v. Masters Sec.*, 126 A.3d 1125, 1136 (D.C. 2015) (quoting *Henderson*, 710 A.2d at 877, and collecting cases) (internal marks omitted).

Gross negligence is a high bar, and even when looking at the evidence in the light most favorable to the non-moving party, we think it is unreasonable for a jury to find gross negligence in such a scenario. In *Henderson* it was not enough that the officer was driving up to ten miles per hour above the speed limit, drove through red lights, failed to slow down at intersections, drove too fast for conditions, or even violated procedures for emergency runs in an MPD General Order. *Henderson*, 710 A.2d at 877. Thus, in light of our precedent, a jury could not find that Officer Bennett, driving at a normal rate of speed, turning onto a small residential street without looking both ways while responding to a dispatch was wanton, willful, or reckless.

\*   \*   \*

Neither Ms. Thorne nor Ms. Dinga is guaranteed to win her case, but we conclude that such evidence exists that the question whether Officer Bennett was ordinarily negligent should be submitted to the jury alongside the question whether Officer Bennett was or was not on an emergency run.

## IV.   Conclusion

For the foregoing reasons, the judgment of the Superior Court is reversed in part and this matter is remanded for further proceedings consistent with this opinion.

*So ordered.*